```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
 2
     ----------------------------------------
 3   ARKIL JOHNSON,

 4                              Plaintiff,

 5

 6          - vs -           Docket Number
                             05CV451
 7

 8   SUPERINTENDENT TIMOTHY HABLE, et al.

 9                              Defendants.

10   ----------------------------------------

11                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE RICHARD J. ARCARA
12                UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15
     For the Plaintiff:         STEPHEN W. KELKENBERG, ESQ.,
16                              BENJAMIN AHLSTROM, ESQ.,
                                and REENA DUTTA, ESQ.
17

18   For the Defendant:         GEORGE ZIMMERMAN, ESQ.

19

20   Court Reporter:            YVONNE M. GARRISON, RPR
                                Official Court Reporter
21                              Yvonne_garrison@aol.com

22

23   Taken on December 6, 2010 at 2:13 p.m.

24

25           (Jury present.)
```

```
 1              THE COURT:  All right.  Let's start the trial.
 2         Counsel.
 3              MR. AHLSTROM:  Good morning, Your Honor.  We call
 4    Mr. Arkil Johnson.
 5
 6              A R K I L   J O H N S O N, SWORN,
 7
 8              THE CLERK:  For the record, would you please give
 9    your full name and spell your last name for the record.
10              THE WITNESS:  My name, Arkil Johnson, J-O-H-N-S-O-N.
11              THE CLERK:  Would you spell your first name also?
12              THE WITNESS:  A-R-K-I-L, Arkil.
13
14                        DIRECT EXAMINATION
15    BY MR. AHLSTROM:
16    Q.   Mr. Johnson, your lawsuit involves some events that
17    occurred on November, 2002.  Do you remember those events?
18    A.   Yes.
19    Q.   And are you prepared to testify today about that?
20    A.   Yes.
21    Q.   All right.  First I'd like to give the jury a little
22    background.  How old are you?
23    A.   Thirty-six.
24    Q.   And where were you born?
25    A.   In Manhattan Flower Fifth Hospital.
```

1    Q.    And can you tell the jury a little bit about your family?

2    A.    Well, I come from a good family, and I have two kids, son

3    and a daughter.  My daughter just had a baby, a son.  He going

4    to be two this January.  And, you know, basically that's

5    everything.

6    Q.    And where do you currently reside?

7    A.    At Southport Correctional Facility.

8    Q.    And that's where you lived in November, 2002?

9    A.    Yes.

10   Q.    And you lived there also in September, 2002?

11   A.    Yes.

12   Q.    Can you describe the layout of the cell block, C block at

13   Southport?

14   A.    Okay.  When you first come into C block, you have four

15   galleries, one, two, three, four.  Then you have an upstairs

16   and you have a third floor, but on each gallery, you have three

17   showers, and you have 21 cells on each gallery, 21 windows is

18   facing each cell.

19         And correction officer can come around and go on to

20   another gallery, come back onto the main floor, go onto another

21   gallery and come around to another one, come back onto the main

22   floor, and the same thing on each floor, the second and the

23   third floor.

24   Q.    And the galleries, that's just another word for like a

25   hallway?

1    A.    Yes, like -- like a company, that's where the inmates

2    reside at.

3    Q.    And that's -- so the cells are on the gallery?

4    A.    Yes.

5    Q.    And they're all in a line?

6    A.    Yes, from 1 to 21.

7    Q.    And is there a -- sort of a common area in between the

8    galleries?

9    A.    No.

10   Q.    Can you describe where the console is and what that is?

11   A.    The console is -- like as soon as you come onto the block,

12   whatever block, A, B and C, they have a security bubble that

13   would be the console, and within that security bubble, that's

14   where the correction officer controls.

15         Like, okay, say I'm in console right now.  This would be

16   one gallery.  He can stand right here.  He opens the door for

17   each cell.  Okay?  He can go over here and see 2 gallery.  He

18   can open up the cells.  Then he goes over here, this is three

19   and four.

20         So the console is just a security -- security bubble where

21   the officer can, you know, open -- he controls the inmate's

22   movements by opening the cell doors and the showers.

23   Q.    And what cell were you in on November 2nd, 2002?

24   A.    I was in 2 cell, I was in 2.

25   Q.    And where is 2 cell on the -- on the gallery?

1    A.    Okay.  2 cell is not that far from -- there's three

2    showers.  As soon as you pass the three showers, there's one

3    cell, and then 2 cell is right next to it, and then the other

4    cells coming down from -- I just explained from 1 to 21.

5    Q.    Approximately how far is it from your cell to the showers?

6    A.    Approximately I would say about -- not that far.  About a

7    good maybe seven inches or something like that, not that far

8    possibly.

9    Q.    A few feet?

10   A.    Yeah.

11   Q.    And can you describe your cell, C1-2?

12   A.    Okay.  Well, you have a cell door with a feed-up hatch.

13   Inside the cell you have a bed.  You have a desk where you

14   write at.  And then there was a toilet that's connected to the

15   sink.

16   Q.    You mentioned a feed-up hatch.  What's the feed-up hatch?

17   A.    The feed-up hatch would be on the cell door.  That's where

18   you stick your hands through the gate, you know, handcuff, or

19   you know, you receive your mail through there, and, you know,

20   your packages or whatever because you in a lock-down facility.

21   So, you know, basically everything comes through the feed-up

22   hatch.

23   Q.    Explain the configuration of the bars and the metal on the

24   cell door and the cell wall.

25   A.    Okay.  The bars is like -- like chicken fence, and, you

```
 1    know, they come down, and they go straight like this, come down
 2    and go straight.
 3              MR. AHLSTROM:  Your Honor, may I approach?
 4              THE COURT:  Yes.
 5    BY MR. AHLSTROM:
 6    Q.   I'm handing you what's been marked as Plaintiff's
 7    Exhibit 31.  What is Plaintiff Exhibit 31?
 8    A.   This is the front of the cell, the middle entrance.  That
 9    would be the feed-up hatch.  And over the feed-up hatch you
10    have the inmate's information and his last name and the door
11    handle, and like I just explained, the feed-up hatch.
12    Q.   Mr. Johnson, is Plaintiff's Exhibit 31, is that a fair and
13    accurate drawing of the cell C1-2?
14    A.   Yes, it is.
15              MR. AHLSTROM:  Your Honor, I offer Plaintiff's
16    Exhibit 31.
17              MR. ZIMMERMAN:  Your Honor, I object pending voir
18    dire.  I don't know if the Court would like me to do it now.
19              THE COURT:  Do it now.
20              MR. ZIMMERMAN:  May I approach, Your Honor?
21              THE COURT:  Sure.
22
23                        VOIR DIRE EXAMINATION
24    BY MR. ZIMMERMAN:
25    Q.   Sir, I've placed Exhibit 31 in front of you.  Do you know
```

1    who drew that?

2    A.    Do I know who drew it?

3    Q.    Yes.

4    A.    Yes, an individual that's on the same company with me.

5    Q.    And who -- what is that person's name?

6    A.    What's his name?

7    Q.    Yes.

8    A.    Last name, I think Hernandez.

9    Q.    And what cell does he lock in?

10   A.    He's in 3.

11   Q.    Okay.  Do you know, did you measure -- did you take a tape

12   measure and measure the cell?

13   A.    Southport, yes.

14   Q.    At Southport?

15   A.    Yes.

16   Q.    You did that?

17   A.    Yes.

18   Q.    You were given a tape measure?

19   A.    No.  I just know -- I know the measurements of it.

20   Q.    And how is it that you know the measurements?

21   A.    The cell is nine by five.

22   Q.    Okay.  And how about the door, do you know -- did you

23   measure that?

24   A.    No.

25   Q.    Okay.  Do you know if Mr. Hernandez measured it?

1   A.   No.

2   Q.   Do you know if Mr. Hernandez measured the height of the

3   door?

4   A.   No.

5   Q.   Do you know -- I see these lines --

6           THE COURT:   Just one second.   Where in the book,

7   Exhibit 31?

8           MR. ZIMMERMAN:   Your Honor, that's a new exhibit.

9           MR. AHLSTROM:   Your Honor, I think we provided you

10  with a copy in your book this morning.

11          THE COURT:   I think we have that as some other

12  document.   Is this 31?

13          MR. AHLSTROM:   We do have another copy, Your Honor.

14  BY MR. ZIMMERMAN:

15  Q.   And, sir, the mesh on the cell doors, that's a thick

16  metal; is that correct?

17  A.   Yes, all the mesh is a thick metal.

18  Q.   Yeah.   And I know you used chicken wire to describe it,

19  which is a pretty good description, but chicken wire is kind of

20  a thin wire and these wires are much thicker; isn't that

21  correct?

22  A.   Yes.

23  Q.   And the mesh is actually wound or woven so tightly you

24  can't get your fingers through it; is that correct?

25  A.   Yes, you can get one finger through.

```
 1    Q.    Okay.  You can get one finger through, okay.

 2          And it appears on this drawing that the mesh is bigger

 3    than that.  These squares look bigger than just a finger's

 4    size.  Wouldn't you agree with me on that?

 5    A.    Yes.

 6    Q.    And, sir, on C1 gallery, the hatches are locked; isn't

 7    that correct?

 8    A.    Yes.

 9    Q.    When they're not in use for food and that sort of thing?

10    A.    Yes.

11    Q.    And there's no depiction of a lock on this; is that

12    correct, sir?

13    A.    No.

14    Q.    It's correct, right?

15    A.    Yes.

16    Q.    Oh, okay.

17          MR. ZIMMERMAN:  Your Honor, I'd object.  There's no

18    showing that this is to scale, and it's missing certain things.

19    If it's just being admitted as illustrative and it's not --

20          THE COURT:  That's all its being admitted for?

21          MR. AHLSTROM:  Yes.  We're not representing that it's

22    exact.

23          THE COURT:  The jury will understand that.

24          MR. ZIMMERMAN:  Then that's fine, Your Honor.

25          THE COURT:  Just give an idea of what this looks
```

1   like, okay.  It's certainly not to scale, but it's generally a

2   fair representation as I understand it.  You can put it on the

3   video camera so everyone can see what we're looking at.

4                (The following was received in Evidence:

5                Plaintiff's Exhibit 31.)

6

7                     DIRECT EXAMINATION (Continued)

8   BY MR. AHLSTROM:

9   Q.   Mr. Johnson, you also have a screen with you that the

10  exhibit should be on.

11  A.   Yes, um-hum.

12  Q.   Can you describe again where the feed-up hatch is located?

13  A.   Okay.  The feed-up hatch is right here in the middle.

14  Q.   And, again, point out where the chicken wire-like mesh is.

15  A.   Right here.

16  Q.   And where is the door on this drawing?

17  A.   This would be the door.

18  Q.   Underneath the two?

19  A.   Yes.

20  Q.   How does the door open?

21  A.   Sideways, but also it can be opened manual too.  That's if

22  it's stuck, like if the officer is in the console and it's

23  stuck, they can also stick something up top and they can just

24  pull it.  That's why they got the handle right here.  They can

25  just pull it to the side.

1   Q.   And the door is on a track so that it slides?

2   A.   I would presume so.

3   Q.   It's not on a hinge like the doors in this courtroom that

4   open in and out?

5   A.   No, no, no, no.  Yes, it slides.

6   Q.   Okay.  And on the cell door and the cell wall, do all of

7   the bars meet at square angles?

8   A.   No, they -- they connect.  They connect like -- okay,

9   that -- this would be the cell gate.  This would be a wall on

10  the right-hand side.  Then there's a wall in the middle.  Then

11  there's a wall on the left connecting toward the gate right

12  here.

13  Q.   How are you able to see out of your cell?

14  A.   Well, basically what you've got to do is come to the door

15  or you go like -- be right here on the side.

16  Q.   What can you see from your cell?

17  A.   Well, it depends.  It depends on what cell you in.  If I'm

18  in -- if I'm in 2 cell, I could see a little, at least three

19  cells down.

20  Q.   If you touch the lower left-hand corner of that screen, it

21  will make the arrows go away, in the lower left-hand corner.

22  Thank you.

23       And from your cell are you able to talk to other inmates

24  nearby?

25  A.   Yes.

1  Q.   And throughout the course of a month or a year, do you --

2  are you always in the same cell or are you moved?

3  A.   No, you're moved.

4  Q.   How often do you have contact with your family or other

5  people outside the prison?

6  A.   Whenever they come to visit you.  The visiting hour days

7  are Saturday and Sunday.

8  Q.   And do you -- do you communicate with them other than

9  through visits?

10  A.   Yes.

11  Q.   And how do you do that?

12  A.   Through correspondence, through mail.

13  Q.   How many defendants -- excuse me -- how many corrections

14  officers are on the 1 gallery of C block or on C block?

15  A.   Well, depending on what -- what activity is, you know,

16  like a shower or exercise detail, it would be one officer

17  that's the floor officer, unless you be in -- you know, you got

18  called out, you being escorted to the medical or a visit, and

19  it's only one officer, the floor officer, besides the officer

20  that's in the console.

21  Q.   And for rec how many officers are there usually on the

22  gallery or on the block?

23  A.   Well, it's usually three officers, sometimes two, and a

24  lot of times there's never a sergeant with these officers when

25  they do rec detail.  Plenty of times there's never a sergeant.

1    So sometimes you might have two officers, one, you know, but

2    depending on what level you're on, sometimes you might have

3    two, sometimes you might have three.

4    Q.   Do you know the officers by name?

5    A.   Some of them, some of them.

6    Q.   Do you see some of the same officers over and over?

7    A.   Yes.  Yes, you interact with them, yes.

8    Q.   And you recognize their faces?

9    A.   Yes.

10   Q.   Are you friendly with any of the officers?

11   A.   Some of them, some of them.

12   Q.   Do the officers, do they carry weapons?

13   A.   Some of them.  Some of them have batons, and some don't.

14   Q.   What do you mean by baton?

15   A.   A baton is like a stick that they wear on their side.

16   Q.   Do they also -- do they carry guns?

17   A.   No.

18   Q.   Other than on November 2nd, 2002, have you ever seen one

19   of the officers with a knife?

20   A.   Yes, I've seen a legal mail officer plenty of times

21   opening legal mail with a knife, a little short knife, plenty

22   of times.

23   Q.   And when you're outside of your cell, are you ever alone

24   with just one officer?

25   A.   It depends.  It depends where you're going, like I just

1    said.   Sometime if you're going to medical, three officers

2    might come, or if you're going to rec, you know, three or four.

3    It depends.

4    Q.    And when you're going to rec, you're escorted by multiple

5    officers?

6    A.    Yes, yes.

7    Q.    Do the -- do the officers, do they check your cell for

8    contraband?

9    A.    Yes.

10   Q.    And what's considered contraband?

11   A.    Anything that's considered contraband that's not -- should

12   I say -- that the superintendent doesn't allow.   So like a

13   razor, any drug paraphernalia, things of that nature, that

14   would be considered contraband.

15   Q.    And how frequently do the officers check your cell for

16   contraband?

17   A.    Well, it comes from the deputy superintendent.   Your cell

18   can be searched five times out of the week.   It depends on how

19   many times your name come up or, you know, for what activity,

20   but your cell can be searched every day.

21   Q.    And do you know in advance if your cell is going to be

22   searched?

23   A.    No.   No, they just come -- certain officers just come,

24   stop in front of your cell, and say "cell search."

25   Q.    What happens if a guard does find contraband in your cell?

1   A.    Okay.  What happens is the guard will take it to his

2   superior, which will be a sergeant.  The sergeant would

3   identify what the contraband is.  He would tell the officer who

4   found it to write a contraband slip where he found the

5   contraband at, whether it was underneath the desk, the bed, or

6   what have you.

7        And then he would tell the officer to fill out a

8   misbehavior report, and stated inside the body of that

9   misbehavior report would be the contraband that will be found.

10  And pertaining to Chapter 5, if there was another officer who

11  eyewitnessed it, he would either endorse his name or write a

12  separate -- or a separate report.

13  Q.    And ultimately you could be disciplined?

14  A.    Yes.

15  Q.    Before the events on November 2nd, 2002, do you recall the

16  last time before that that officers checked your cell?

17  A.    No, not offhand, no.

18  Q.    And approximately how long are you in your cell each day

19  on the C1 gallery?

20  A.    Well, if you don't go outside, you're in your cell for

21  24 hours unless you are able to go to the shower.  Unless

22  you're not deprived of a shower and you don't go outside,

23  you're in your cell for 24 hours.

24  Q.    You mentioned showers.  What other opportunities would you

25  have to leave your cell if you're on the C1 gallery?

1   A.   Haircuts, besides visit, call-outs to the medical, which

2   would be like to the -- you know, the dentist, x-rays, things

3   of that nature.

4   Q.   Recreation?

5   A.   Yes, recreation.

6   Q.   And how long is recreation if you're eligible?

7   A.   Recreation could be anywhere between 35 to 45 minutes

8   depending on how they running it or what gallery they start on.

9   Q.   And you do not leave your cell to eat?

10   A.   No, no.  The food is brought to your cell.

11   Q.   So is there ever a day when you do not leave your cell?

12   A.   No, besides -- unless you going on a call-out or if you're

13   going to rec or to the shower, no.

14   Q.   What does it mean to be deprived?

15   A.   To be deprived means -- okay.  If I'm deprived a shower, I

16   can't go to the shower, whoever is deprived of the shower can't

17   go to the shower, whoever is deprived of exercise can't go to

18   exercise, whoever is deprived of barber shop can't go to the

19   barber shop.  Only those who are not deprived.  So let's just

20   say out of 21 individuals, if you have three individuals that's

21   deprived, them three cannot attend whatever exercise or

22   haircuts, cell clean-up because they're deprived.

23   Q.   And you can also refuse to participate in activities if

24   you don't want to?

25   A.   Yes.

1  Q.   So you could decide that you didn't want to go to

2  recreation one day?

3  A.   Yes, it's up to the individual if he wants to go or not.

4  Q.   Okay.  Let's talk a little bit about the procedure for

5  leaving the cell to go to recreation.  Can you describe the

6  procedure?

7  A.   Okay.  The procedure, all right, you put your -- the

8  officers come.  You put your hands through the feed-up hatch,

9  which is just on the window.  They cuff you.  You turn around,

10 which is procedure.  When they open the gate, you wait for the

11 officer to give the command to back out.  He tells you to back

12 up.  You back out.  Then you go, then you walk, you proceed.

13 Q.   How many officers would take you to rec?

14 A.   Well, once they pat frisk you, you walk onto the main

15 floor.  The main floor is where you would encounter other

16 officers, and you would have an officer with a wand.  He'll

17 wand you down.  Wand you down, meaning make sure you don't have

18 no type of metal or anything on you of that nature.

19      Then they pat frisk you again and tell you to proceed, and

20 you would walk by yourself to exercise rec pens.

21 Q.   So first you put your hands through the feed-up slot for

22 handcuffs to be applied?

23 A.   Yes.

24 Q.   How many officers are there to do that?

25 A.   Okay.  Approximately you might have two or three,

1   sometimes four.  It varies.  It depends.

2   Q.   And then you turn around so that your back is facing the

3   door?

4   A.   Yes, so that your back is faced to the gate because that's

5   procedure.

6   Q.   And will the guards open the door unless your back is

7   turned to them?

8   A.   Unless they see your back, yes.  Once they see your back,

9   then they waive it like this.  That lets the officer in the

10  console know that it's all right to open the cell.  And once

11  they do that, he opens the cell, and you wait for the officer

12  to give you the command to back out.

13  Q.   So if you don't turn your back to the officers, they won't

14  open the door?

15  A.   No, they will not open your cell at all.

16  Q.   And after they open the cell door, what happens?

17  A.   Okay.  After they open the cell door, depends on what

18  floor you're on, they would apply the waist chain, and then

19  they tell you to take it out to the main floor.  That's where

20  the other officers would be where they will wand you and pat

21  you down, make sure you don't have anything, and then you

22  proceed to the rec pens.

23  Q.   Describe the waist chains.

24  A.   Okay.  The waist chain, it's about this much in the

25  middle.  The handcuffs has a loop, a loop-like certain thing

```
1   where once the handcuffs are on you, the officer will put the
2   waist chain through the little loop, and that's the security.
3   It will go around you approximately maybe once or twice.  Then
4   once it's securely around you, they will lock it with a master
5   lock.
6   Q.   So when the waist chain is applied, where are your hands?
7   A.   In front of you.
8   Q.   At your waist level?
9   A.   Yes.
10  Q.   And are you able to move them when the waist chain is on?
11  A.   Yes.
12  Q.   And how far can you move your hands when the waist chain
13  is on?
14  A.   Not that far.  Sometimes your hands is in back of you, and
15  they will put the waist chain on you the same way as if it was
16  to the front.
17  Q.   And the waist chain is applied while your back is facing
18  the guards?
19  A.   Yeah -- no.  As soon as they open the door, they give the
20  order to open the door and you back out.  One officer is on
21  this side, one officer is on this side.  He puts the waist
22  chain through the little ring thing on the handcuffs and
23  secures it, and once it's secured, then you put the lock on.
24  Q.   And when do they tell you that it's okay to turn around
25  and face them?
```

1   A.   Once it's secure.  Once the lock is secure on the waist

2   chain, then they tell you to proceed, take it out.

3   Q.   Do the -- do the officers ever move multiple inmates at

4   the same time?

5   A.   No.

6   Q.   So only one cell door is open at a time?

7   A.   One at a time.

8   Q.   And have you ever been in -- in close proximity or close

9   range with one of the officers when you haven't been in some

10   form of restraint?

11   A.   No, unless they're taking you out to medical.  If they're

12   taking you out to medical is they come and put the handcuffs on

13   you from the back.  There's no need to put a waist chain on you

14   unless you're down on the first floor, something like that.

15   Q.   If you have a problem with the guards, if you think they

16   did something wrong, how do you complain about that?

17   A.   Okay.  Two things, two devices.  You could either write a

18   grievance or you could write a complaint straight to the

19   superintendent.

20   Q.   And then the reverse question, if a -- if a guard has a

21   problem with you, what happens?

22   A.   Okay.  If a guard has a problem with you, like, you know,

23   they can do two things, like they can write you up or things

24   like that, or they can just, you know, give you a reprimand.

25   Q.   And --

```
 1    A.    A reprimand would be, you know, if they see you doing

 2    certain things, you know not to do that again.

 3    Q.    If charges are brought, are you notified of the charges?

 4    A.    Yes.

 5    Q.    Is there some sort of hearing?

 6    A.    Yes.

 7    Q.    Okay.  Can you just briefly describe that?

 8    A.    Okay.  If you have a misbehavior report, they have to call

 9    you within 14 days.  The superintendent designates an

10    individual to hold a hearing.  Once you go in there to the

11    hearing, he reads out the charges, asks you how do you plea,

12    guilty or not guilty.  You state, you know, your story, what

13    happened.  And then he'll call the officer who authored the

14    ticket, and he'll ask him to give his version of what he wrote.

15    Q.    The individual who holds the hearing, who is that?

16    A.    Well, it could be anybody.  It could be anybody.  It could

17    be the deputy of security.  It could be a captain.  One of my

18    hearings, I had a cook.

19    Q.    And are you represented by an attorney at the -- at the

20    hearing?

21    A.    No, no, just you by yourself.

22    Q.    And are you allowed to ask the witnesses questions?

23    A.    Yes.

24    Q.    Do you ask them directly to the witnesses or do you ask

25    them through the hearing officer or the cook?
```

1   A.   You ask -- any questions that you have -- that you have,

2   you would ask them through the hearing officer and he will ask

3   the questions for you.

4   Q.   Okay.  Now, let's talk specifically about November 2nd,

5   2002.  Okay?

6   A.   Yes.

7   Q.   Where were you that day?

8   A.   I was in my cell.

9   Q.   And which cell?

10  A.   2 cell.

11  Q.   And I understand you were leaving your cell.  Can you --

12  can you describe what was happening?

13  A.   Okay.  Officer Hable and Officer Lovejoy approached my

14  cell on November 2nd.  They asked me was I going to rec.  I

15  told them yes, I was going to rec.  Officer Hable handed me my

16  coat.  I put the coat on, put my hands through the feed-up

17  hatch, and he cuffed them, because when I turned around, I

18  waited for the cell gate to open.

19       Still proceed?

20  Q.   Yes.

21  A.   Okay.  I waited for the cell gate to open.  Once the cell

22  gate opened, I waited for the -- either one officer to give the

23  command so I could back out.  Officer Hable tells me to back

24  out.

25       Now, when I back out, Officer Hable is on the right side

1  of me and Officer Lovejoy is on the left side of me.  Officer

2  Hable grabs me by my right arm.  At the same time Officer

3  Lovejoy grabbed me on the left arm.  Officer Hable shoves me

4  back into the cell.  When he shoved me back into the cell,

5  Officer Lovejoy tripped me.

6      Now, while I'm on the floor, you have a multitude of

7  officers come into the cell, including two sergeants.  There

8  were plenty of officers in my cell, but I didn't know their

9  name.  I just knew them by their face, you know.  They've taken

10  me to visit or taken me to the medical.

11      But the officers that were assaulting me in my cell were

12  Hable, Lovejoy, Sergeant Raub, Sergeant Osborne, Officer

13  Marshall, Officer Page, Officer Byrington, Officer Houser, and

14  Officer Boulas.

15      Now, while I was on the floor, Sergeant Raub, while my

16  face was to the side, he had his knee in my neck.  Officer

17  Hable had grabbed my coat collar.  He banged my head on the

18  floor twice.

19      At that time Officer Houser was on the left side.  Officer

20  Houser grabbed me by my arm on the left side.  There was

21  another officer, an unidentified officer, I didn't know his

22  name, grabbed my other arm, the right arm.  They both dragged

23  me over to the bed.

24      Now, they lifted me up.  Sergeant Raub told Officer

25  Byrington get the leg irons.  When he had the leg irons on,

1    multiple officers were striking me, hitting me.  So now Officer

2    Houser took my -- the left hand and brought it to the back.

3    The same unidentified officer who I didn't know grabbed my

4    right hand, and he brought it to the back.  So now I'm

5    handcuffed to the back.

6         They put the waist chain on.  Officer Houser grabbed the

7    waist chain, put the waist chain on me securely.  Sergeant Raub

8    was standing to this side.  Now, I looked at Sergeant Raub and

9    asked him, "Why is you letting these officers do that?  You

10   standing there, and you see what these officers are doing."

11        Now, what I'm about to tell you, excuse my profanity, but

12   this is per verbatim what he said.  He told me, "Shut the fuck

13   up, nigger," and he struck me.  He struck me -- Officer

14   Marshall struck me.  So now I'm turning my face to the side,

15   because there was no way I could block, you know, these

16   officers, you know, hitting me and kicking me.

17        So while my face is to the side, I see Hable on this side

18   of me.  There was some type of metallic object that he had in

19   his hand.  He grabbed me by my hair, and that's when he cut me.

20   Now, when he cut me, this is exactly what he said.  He said, "I

21   told you I was going to get you again, nigger, and I meant

22   that."

23        Now, the blood started coming down my face and coming and

24   getting in my eye.  They stood me up.  Officer Hable was on

25   this side of me again, the left side, and Officer Marshall was

1    on the right side.  Now, before they brought me out,

2    Marshall -- Officer Marshall struck me and grabbed me and ran

3    my face into the gate.

4        While we was leaving out the cell, Hable grabbed my hair

5    and rammed my face directly into the wall.  That's how it was a

6    smear, it was a crimson stain going across the wall like this

7    in a swerve.

8        Officer -- Sergeant Osborne directed the officer to put me

9    in the second shower.  While I'm in the second shower with my

10   hands behind my back like this, the blood is coming down and

11   coming in my eye.  There's no way for me to, you know, stop the

12   blood or wipe it out of my eye.

13           THE WITNESS:  Excuse me, Your Honor, can I stand up

14   for a minute and show the jury how I --

15           THE COURT:  Sure.

16           THE WITNESS:  I'm standing like this with my hands

17   behind my back with a waist chain, and I have leg irons on.

18   Now, the blood is coming down getting in my eye.  I had to bend

19   down like this to wipe my face on my pants because there was no

20   way I could get the blood from not getting in my eye.  So I'm

21   in the shower for an hour and a half.

22   BY MR. AHLSTROM:

23   Q.   You mentioned a number of guards.

24   A.   Yes.

25   Q.   A number of them are defendants.

```
 1   A.   Yes.

 2   Q.   And do you recognize them?

 3   A.   Yes.

 4   Q.   Are they here in this courtroom?

 5   A.   Yes.

 6   Q.   Can you point them out?

 7   A.   Okay.  You have Sergeant Osborne with the white shirt

 8   standing in the front.  You have Officer Marshall, he's sitting

 9   next to Sergeant Osborne.  You have Officer Boulas, he's

10   sitting one chair away from Officer Marshall because there's

11   nobody in the middle.  In back of him you have Officer Page.

12   Next to him you have Officer Lovejoy.  Next to Officer Lovejoy

13   you have Officer Hable.  Next to Officer Hable you have --

14   because there's so many --

15   Q.   Mr. Johnson, which were the two officers that initially

16   approached your cell?

17   A.   Officer Hable and Officer Lovejoy.

18   Q.   And then as closely as possible, do you remember who

19   joined in after --

20   A.   Yes.  After that you had Officer Raub -- Sergeant Raub and

21   Sergeant Osborne and then multiple different officers, and they

22   all had came at the same time.

23   Q.   And you saw each of the other defendants?

24   A.   Yes.

25   Q.   In your cell that day?
```

1    A.    Yes.

2    Q.    Did any of the guards, other than what you've already told

3    us, did any of the guards say anything to you during this?

4    A.    Yes.  A lot of them was yelling profanities and stuff

5    while they were striking me, you know, calling me nigger and

6    stuff like that.  They were, you know, using a lot of

7    profanity.

8          Next to Officer Hable, that's Officer Houser, and behind

9    Officer Houser would be Officer Byrington.

10   Q.    Before you were -- before any of this -- these events,

11   this assault happened, were you already handcuffed?

12   A.    Yes, I was handcuffed throughout the whole ordeal.

13   Q.    At no point were you not restrained in some way?

14   A.    No, at no point I was not restrained.

15         MR. ZIMMERMAN:  Your Honor, I'm going to object to

16   the leading by the counsel.  This is direct, and we already

17   heard the meat of the case.

18         THE COURT:  Overruled.  I'm going to allow a little

19   leading.

20         THE WITNESS:  Continue?

21   BY MR. AHLSTROM:

22   Q.    I'm going to show you an exhibit.

23         MR. AHLSTROM:  May I approach, Your Honor?

24         THE COURT:  Yes.

25   BY MR. AHLSTROM:

 1   Q.   I've handed you what's been marked as Exhibit 2, and that

 2   includes Exhibits 2A through L.

 3   A.   Okay.   These are use of force reports.

 4   Q.   And have you seen -- have you seen this document before?

 5   A.   Yes.

 6   Q.   This isn't a document that you authored?

 7   A.   No.

 8   Q.   Who did, to the best of your knowledge?

 9   A.   The name that I see is Sergeant Raub.   Sergeant Raub

10   authored this.

11   Q.   And there -- underneath the use of force report there are

12   a number of other documents.   What are those?

13   A.   Okay.   Under the use of force you would have the physical

14   examination that Nurse Peters signed.   Under that you would

15   have the officers' memorandums.   Each officer signed -- gave

16   this statement of their own version of the events to the

17   superintendent.

18   Q.   And is there -- I'm sorry to interrupt.   Is there a common

19   name for the officers' memorandum?

20   A.   Yes, it's called a to and from, because it's going to the

21   superintendent from whatever officer who's giving his version

22   of what took place.

23          MR. AHLSTROM:   Your Honor, we have stipulated to the

24   admissibility of Exhibit 2 and Exhibit 2A through L, so at this

25   time I'd offer them.

```
 1                THE COURT:  All right.

 2                MR. ZIMMERMAN:  No objection, Your Honor.

 3                THE COURT:  They'll be received.

 4

 5                (The following were received in Evidence:

 6                Plaintiff's Exhibit 2, 2A - 2L.)

 7

 8                THE COURT:  Which one are you putting up on the

 9    screen?

10                MR. AHLSTROM:  This is the first page.  This is

11    Exhibit 2.

12    BY MR. AHLSTROM:

13    Q.   Now, Mr. Johnson, in the description of the events, it

14    notes that you while handcuffs -- "While in handcuffs, the

15    waist chain was being applied, and Inmate Johnson raised his

16    arms over his head and attempted to turn towards officers."

17         Is that what occurred on November 2nd?

18    A.   No, not at all.

19    Q.   Did you -- did you threaten the officers?

20    A.   No, not at all.

21    Q.   Then if you look further down on the page in the

22    description of the force used, in the first line it says, "The

23    inmate moved forward and guided to the bed."

24         Now, Mr. Johnson, were you guided to the bed by the

25    defendants?
```

1   A.   No.  No, I was tripped to the floor by Officer Lovejoy,

2   and then while I was being struck after Officer Hable grabbed

3   me by my coat collar and banged my head on the floor while

4   Sergeant Raub had his knee.  Officer Houser, that's when he

5   grabbed me by the left side of my arm and another unidentified

6   officer while I had the leg irons on, and they dragged me over

7   to the bed.

8   Q.   It also says that, "Officer Lovejoy used his hands to

9   control your right arm."  Did -- what happened?

10   A.   No, that's not true.  What happened was, like I just

11   explained, when they gave -- when I was waiting for the order,

12   once the cell gate was open waiting for the officer to tell me

13   to back out, Officer Hable told me to back out.

14        That's when he grabbed me, because he was on this side of

15   me, the right side.  He grabbed me by the right arm, and

16   Officer Lovejoy grabbed me on the left side.  Now, Officer

17   Hable shoved me into the cell now.  When he shoved me into the

18   cell, that's when Officer Lovejoy tripped me.  And while I was

19   on the floor, a multitude of prison guards came into the cell,

20   including two sergeants.

21   Q.   As you were leaving the cell after the assault, this

22   description notes that Officer Boulas and Officer Ayres took

23   control of your arms.  How did they do that?

24   A.   No, that's not true.  While I was in the cell, Officer

25   Hable, after he just got finished cutting me, grabbed me.  He

1   stood me up from off the bed.  He was on the left side of me,

2   and Officer Marshall was on the right side of me.  After

3   Officer Marshall struck me, that's when they both brought me

4   out to the gallery -- like on to the gallery floor.

5       Officer Hable grabbed me by my hair, and that's when he

6   ran my face into the wall, like how I just explained a few

7   minutes ago.  That's how it was a crimson bloodstain going this

8   way in a U on the wall.

9   Q.   After your head was struck on the wall, where were you

10  taken?

11  A.   Okay.  Sergeant Osborne gave the order to the two officers

12  to place me in the second shower, and that's where I was until

13  they came and took use of force photos.

14  Q.   How far away is the shower?

15  A.   From the cell?

16  Q.   Um-hum.

17  A.   Just a few feet.

18  Q.   How long did it take you to get there?

19  A.   No time at all, no time at all.  It's like leaving here to

20  go to where them chairs is at right there.  No time at all.

21  Q.   You mentioned that officers came to take photographs of

22  you.  Can you describe that process?

23  A.   Okay.  Well, I would like to -- before I describe that,

24  while I was in the shower bleeding, I was in the shower for an

25  hour --

```
 1              MR. ZIMMERMAN:  Objection, Your Honor,

 2   non-responsive.

 3              THE COURT:  Yeah.  He can ask you the question in a

 4   little more detail.

 5              THE WITNESS:  Okay.

 6   BY MR. AHLSTROM:

 7   Q.   Mr. Johnson, what occurred while you were in the shower?

 8   Did you have any other interactions with the defendants?

 9   A.   No.

10   Q.   What occurred while you were in the shower?

11   A.   No.  While I was in the shower, I was there for, like I

12   just said, an hour and a half while the blood was coming down

13   my face.  I seen Nurse Peters, but we don't call her -- we call

14   her Aggie, so she was standing in the middle of the officers

15   that, you know, were in my cell assaulting me.

16        So when I seen her, I called her, I said, "Aggie, can you

17   please come over here?  I'm bleeding.  I don't know where I'm

18   bleeding from."  She shook her head.  She said, "I'm not coming

19   over there, Johnson."

20        So I called her again, I said, "Aggie, can you please come

21   over here?  I'm bleeding.  I don't know where I'm bleeding

22   from.  Can you please come over here?"  She shook her head

23   again.  "No, Johnson, I'm not coming over there."

24        So now the blood is still coming -- you know, getting in

25   my eye.  So like I had just explained, I had to bend down again
```

1   to wipe my face on my pants.  When I stood up again, I called

2   Aggie again.  I said, "Aggie, can you please come over here?

3   I'm bleeding a lot.  I don't know where I'm bleeding from."

4   She told me, "I'm not coming over there."

5       Five minutes later after that, that's when Sergeant

6   Osborne came, and he told me, "Johnson, we're going to take use

7   of force photos.  Turn around.  Walk to the front of the

8   shower."  And that's what I did.  I walked to the front of the

9   shower, and they opened up the shower.

10      When they opened up the shower, an officer, who I didn't

11  know his name, he uncuffed me from the back and brought my

12  hands to the front.  When they escorted me from the shower,

13  they escorted me to the main floor.  And that's when Nurse

14  Peters came and she examined the wound.  She, you know, put a

15  gauze, because it was bleeding a lot, and that's when they took

16  use of force photos.

17  Q.   The main floor, is that also referred to as the day room?

18  A.   Yes.  Yes, that's exactly what it would be.

19           MR. AHLSTROM:  Approach?

20           THE COURT:  Yes.

21  BY MR. AHLSTROM:

22  Q.   Showing you what's been marked as Exhibit 15.  Are those

23  the use of force photos?

24  A.   Yes.  Yes, these are use of force photos.

25  Q.   And do those accurately reflect your injuries on

1   November 2nd, 2002?

2   A.   Yes.

3        MR. AHLSTROM:   Your Honor, I offer Plaintiff's

4   Exhibit 15.

5        MR. ZIMMERMAN:   No objection at all, Your Honor.

6        THE COURT:   All right.   It will be received.

7        (The following was received in Evidence:

8        Plaintiff's Exhibit 15.)

9   BY MR. AHLSTROM:

10  Q.   Now, Mr. Johnson, is this one of the use of force photos?

11  A.   Yes.

12  Q.   And can you tell me what time it says?

13  A.   2:49 p.m.

14  Q.   Approximately at what time did the assault occur?

15  A.   Well, the rec detail was 12:37 p.m.

16  Q.   So this is a little more than two hours later?

17  A.   Yes.

18  Q.   And can you describe the injury shown in this photo?

19  A.   The injury I found out, it's a cut to the baseline of my

20  forehead right here.   The baseline would be right here where

21  the hairline starts.

22  Q.   And describe the way the blood was flowing down your face

23  and with your eyes.

24  A.   It was coming down in this manner, in all directions like

25  this, getting in my eye, coming straight down, flowing straight

1    down.

2    Q.   And how did that feel?

3    A.   It felt terrible, because there was no way I could, you

4    know, wipe the blood from my face because my hands were behind

5    my back.  So I was totally handcuffed so there was no way that

6    I can, you know, get the blood from, you know, getting in my

7    eye.

8    Q.   This photograph, was this taken before or after Nurse

9    Peters saw you?

10   A.   This was taken during, because she came to see me.  She

11   examined -- she examined the wound, and, you know, I told her I

12   had other wounds because the handcuffs was so tight on my wrist

13   that my hands were numb.  I told her I couldn't even feel my

14   hands.

15        And she, you know, jotted down what she see instead of,

16   you know, what I was telling her.  And that happened right

17   after -- right after she seen me.  Right after she seen me then

18   they took the use of force.

19   Q.   How much blood was flowing from the cut?

20   A.   It was a lot.  While I was in the shower, it was a lot.

21   It was all on my shirt.  That's why they cut my shirt.  They

22   cut the shirt so they could take the use of force, but it was

23   all over my shirt and, you know, my pants, because I told you I

24   had to bend down and wipe my face with -- because there was no

25   other way that I could stop the blood from getting in my eye.

```
 1   Q.   If you can probably clear that screen, if you can.  Do you
 2   remember how to clear the arrow off the screen?
 3   A.   Yes.
 4   Q.   Thank you.
 5        Describe this picture.  Is this another one of the use of
 6   force photos?
 7   A.   Yes.  That's the use of force photo after they cut my
 8   shirt off.
 9   Q.   And who are the officers in this -- in this photo?
10   A.   Okay.  At the time this is Sergeant Osborne with the white
11   shirt on.  Standing next to him --
12        THE COURT:  Mr. Johnson, there's three people there
13   with a white shirt on.
14        THE WITNESS:  No, no, Sergeant -- I mean, Sergeant
15   Osborne is the only one with a white shirt.  Those are light
16   blue shirts.  And standing next to --
17   BY MR. AHLSTROM:
18   Q.   Can you describe the sergeant?  Is he wearing a hat?
19   A.   Yes, Sergeant Osborne is wearing a hat.  Next to him is
20   Officer Marshall, and this is Officer Page right here.
21        THE COURT:  Just tap the screen.
22   BY MR. AHLSTROM:
23   Q.   So which one is Officer Page?  Just tap the screen.
24   A.   Right here.
25        THE COURT:  It's not showing up.
```

```
 1    BY MR. AHLSTROM:
 2    Q.   A little harder.
 3         Okay.   That's Officer Page and then Officer Marshall; he's
 4    the one without the hat?
 5    A.   Yes.
 6    Q.   And then who's the other officer?
 7    A.   This is Sergeant Osborne.
 8    Q.   Other than the cut to your face and you mentioned the
 9    wrists, did you have any other injuries?
10    A.   Well, when I came back from the hospital, I had a bunch of
11    abrasions around -- around my ankles because the leg irons were
12    tight around my ankles also.
13    Q.   Any injuries on your back?
14    A.   Yes.   On the middle of my neck, I had an injury right here
15    coming down on the spine, in the middle.
16    Q.   About how big are you, Mr. Johnson?
17    A.   About --
18    Q.   About how tall?
19    A.   Five-eight.
20    Q.   And --
21    A.   Maybe five-nine.
22    Q.   And about how much do you weigh?
23    A.   One hundred fifty-two pounds, one hundred fifty-three.
24    Q.   And how do you compare in size to the -- to the
25    defendants?
```

1    A.   Well, mostly all the defendants that were in my cell

2    outweighed me by a lot, and besides Officer Marshall, all the

3    rest of the defendants were either just a little bit taller

4    than me in height.

5    Q.   After the photographs were taken, where did you go?

6    A.   Well, after the photographs was taken, they took me to the

7    facility infirmary, and at the facility infirmary, that's where

8    I stood waiting for transportation to go to the outside

9    hospital, which was Saint Joseph's.

10   Q.   Who saw you in the infirmary?

11   A.   Nurse Peters came again, and she examined the wound, and

12   then I was awaiting transportation to go to Saint Joseph's

13   Hospital.

14   Q.   And were you still bleeding at this time?

15   A.   Yes.  Yes, I was still bleeding a lot.  When they took me

16   to Saint Joseph's Hospital, blood was still on my face and

17   still, you know, coming down from where the wound was at.

18   Q.   Did you notice Nurse Peters taking any notes?

19   A.   No.

20   Q.   When you went to the hospital, who did you see there?

21   A.   Well, when I went to the hospital, I seen a female.  She

22   was, you know, doing the pedigree, what's my name, you know,

23   how old I am and things of that nature.

24   Q.   And what treatment did you receive?

25   A.   Well, I received four sutures to the baseline of my

1    forehead to close the wound.

2    Q.   Did you see a doctor?

3    A.   Yes, yes.  The physician's name was Mr. Shorten

4    (phonetic).  Mr. Shorten who put the sutures in my head.

5    Q.   And approximately how long after the assault occurred was

6    it that you arrived at the hospital?

7    A.   Well, it was 3:00, 3:00.

8    Q.   Were you still bleeding when you arrived at the hospital?

9    A.   Yes.

10   Q.   Were you given any medication at the hospital?

11   A.   No.

12   Q.   Were you given any -- did you receive a tetanus shot?

13   A.   Yes, I received a tetanus shot and something to dead the

14   pain while he put the sutures -- I think it was Novocaine --

15   while he put the sutures in my head.

16   Q.   How long were you at the hospital?

17   A.   Well, I left -- it was like something after 6.

18   Q.   And then you returned to Southport?

19   A.   Yes.

20   Q.   Can you describe the cut to your forehead?

21   A.   Well, the cut, they said it was a jagged edge wound

22   through the thickness of the scalp.

23   Q.   And what does -- what does that mean?

24   A.   That means that it went through the layer, through the

25   baseline of the hair, through the thick part of the scalp it

1  went through.

2  Q.   Do you have a scar?

3  A.   Yes, right here, which is visible right here.

4  Q.   At your hairline?

5  A.   Yes.

6  Q.   And describe the pain.  I mean, on a scale of one to ten,

7  what was the pain like from the cut?

8  A.   Well, it was about like a seven.

9          MR. AHLSTROM:  Approach, Your Honor?

10         THE COURT:  Yes.

11  BY MR. AHLSTROM:

12  Q.   I'll show you what's marked as Plaintiff's Exhibit 1.

13  A.   Okay.  What's in front of me now is the emergency trip

14  from Southport where they were scheduling me to go to Saint

15  Joseph's Hospital.  Underneath that is the report from Nurse

16  Peters on the date the 2nd of November of '02.

17  Q.   This is a collection of your medical records from around

18  the time of November 2nd, 2002?

19  A.   Yes.  Underneath that is a document from Saint Joseph's

20  Emergency Hospital with the physician who examined me,

21  Mr. John K. Shorten.  Underneath that is another document which

22  says "forehead" from --

23         MR. ZIMMERMAN:  Objection, Your Honor.

24         THE COURT:  Is this document in evidence?

25         MR. AHLSTROM:  Your Honor, we'd offer Plaintiff's

1   Exhibit 1.

2        MR. ZIMMERMAN:  Your Honor, that may be, but this is

3   a medical record, and the plaintiff has put nothing on the

4   record to show that he has any medical training to allow him to

5   read from and interpret medical records.

6        THE COURT:  Well, I'll let you cross examine.  Go

7   ahead.

8        MR. AHLSTROM:  May I put these sheets on, Your Honor?

9   They're received?

10        THE COURT:  Sure.

11        (The following was received in Evidence:

12        Plaintiff's Exhibit 1.)

13   BY MR. AHLSTROM:

14   Q.   All right.  In this top -- in this top box, Mr. Johnson,

15   do you see where this notes a laceration to the left side of

16   your forehead?

17   A.   Yes.

18   Q.   Is that consistent with your injuries on November 2nd?

19   A.   Yes.

20   Q.   And then if you look down in the second box, it notes "Red

21   marks on upper T spine and lower C spine area"?

22   A.   Yes.

23   Q.   And what does that refer to?

24   A.   That refers to the back of the neck.

25   Q.   Can you describe the injuries to your back and back of

1    your neck?

2    A.    Yes.   The C right here, where it says T spine and C spine,

3    that would be right here on the bony part of the neck, right in

4    the middle.

5    Q.    And then further down in this second box noted a

6    "Jagged-edged circular laceration to the bony prominence of the

7    left forehead near the hairline," and then later it says,

8    "Appears to be through all the scalp layers"?

9    A.    Yes.

10   Q.    And does that accurately reflect the cut that you had?

11   A.    Yes.

12   Q.    And about how wide open was the cut on your forehead?

13   A.    Approximately like an inch.

14   Q.    And was this -- so the cut was about an inch long, and was

15   this an open cut?

16   A.    Yes.

17          MR. ZIMMERMAN:  Objection on that last question, Your

18   Honor.  I believe plaintiff said that it was an inch open wide,

19   not an inch long.

20          THE COURT:  All right.  You'll be able to examine

21   him.

22   BY MR. AHLSTROM:

23   Q.    And this is a record from the hospital, Mr. Johnson?

24   A.    Yes.

25   Q.    And it notes --

1          MR. ZIMMERMAN:  Your Honor, at this point he's

2    showing him multiple documents that are marked as one exhibit.

3    I'm just wondering if Mr. Ahlstrom could define it so that

4    later on the record will reflect what page we're looking at.

5          THE COURT:  Yes, please refer to that.

6    BY MR. AHLSTROM:

7    Q.   This appears to be the fourth page.  It's labeled "Saint

8    Joseph's Hospital triage primary assessment."  Your name is on

9    this record, Mr. Johnson, in the upper right-hand corner?

10   A.   Yes.

11   Q.   And do you see where it says "chief complaint"?

12   A.   Yeah.

13   Q.   "Las forehead from altercation, unknown object"?

14   A.   Yes.

15   Q.   And what was the unknown object?

16   A.   Unknown object is what Officer Hable had in his hand.

17   Like I had just explained, it was a metallic object that I seen

18   in his hand.

19   Q.   Can you describe that metallic object, the shape, the

20   color?

21   A.   It was about like this in length, and this right here was

22   the metallic part that I seen, because it was in his hand, and

23   that's -- basically that's all I had seen.

24   Q.   This is another hospital record.  It says "ED record,

25   physician's note."  Again, your name is in the upper right-hand

1   corner of this document?

2   A.   Yes.

3   Q.   Do you see where I'm pointing, it says, "Clean-looking

4   S-shaped laceration"?

5   A.   Yes.

6   Q.   And does that -- is that consistent with your injuries?

7   A.   Yes.

8   Q.   And the picture on this of a face, it says, "Half inch

9   long, clean-looking laceration."  Is that picture, does that

10  accurately reflect where your cut was?

11  A.   Yes.

12  Q.   And then it also notes, "No signs concussion."  Do you --

13  do you know what that means, Mr. Johnson?

14  A.   No.

15  Q.   Did you notice any bruising around the cut yourself?

16  A.   Well, Nurse Peters said there was.

17  Q.   And did -- I mean, what was your -- what was your state of

18  mind while you were in the hospital?  Were you -- were you

19  clear-minded?  Were you agitated?  Confused?

20  A.   Well, I was sort of confused.  That's -- I was sort of

21  confused when I arrived there.

22  Q.   Now, you mentioned some injuries to your -- your neck or

23  your back.  Can you describe if there's been any effect after

24  this November 2nd?

25  A.   Yes, I was always complaining about the pain on the side

1   of my back.  I was getting different medications for my back

2   which I take right now.

3   Q.   Had you had back injuries or back problems before this

4   assault?

5   A.   Yes.

6   Q.   And how have the -- how have your injuries changed after

7   the assault?

8   A.   None, none.

9   Q.   Have you received treatment for your back injuries after

10  the assault?

11  A.   Yes, I will go to physical therapy, and, you know, it

12  not -- they will still keep me on the same medication.  If that

13  wasn't working, they will prescribe a different medication for

14  me.

15  Q.   And did you have any other injuries?

16  A.   No, besides me complaining about my back, the abrasions to

17  my wrist, and around the ankle part of my feet, and the

18  baseline of my forehead, no.

19  Q.   Did you complain about the -- these events?

20  A.   Yes.

21  Q.   How?

22  A.   Through a sick call.

23  Q.   What do you mean?

24  A.   Like, it's a procedure.  Like, okay, if you're sick or

25  something, they have a sick call form where you will fill out

1    the form.  And on the piece of paper you'll fill out, you know,

2    what's bothering you, you know, back, pain, headache, things of

3    that nature there.

4         And in the morning when the nurse come around, then you

5    explain to her, you know, what's the problem.  She signs, you

6    know, subjective part, which is, you know, what you told her,

7    and the objective is, you know, what she give you or if she

8    refers you to the doctor.

9    Q.   How long were your sutures in?

10   A.   Approximately a week.

11   Q.   Did you complain about the defendants' actions?

12   A.   Yes.

13   Q.   How did you do that?

14   A.   Yes, I wrote a grievance, and I wrote a complaint to the

15   superintendent, you know, because I told him that the

16   defendants threatened to do bodily harm to me again and that

17   I'm requesting for him to transfer me from this facility.

18   Q.   What was the result of that grievance?

19   A.   Nothing, nothing.  They did nothing.  They just

20   disregarded it.

21        MR. AHLSTROM:  Your Honor, we have stipulated that

22   Mr. Johnson exhausted all the required administrative remedies.

23   BY MR. AHLSTROM:

24   Q.   Were you disciplined as a result of this assault?

25   A.   Yes.

1   Q.   And how did that occur?

2   A.   Okay.  After Officer Hable wrote in his misbehavior report

3   what I allegedly was supposed to have done, when I came back

4   from Saint Joseph's Hospital, they moved me to another block.

5   I was in A block.  This initial incident took place in C block.

6   But when I came back from the hospital, they moved me to A

7   block.

8        While I was in A block, I was awaiting to go to the

9   hearing.  The hearing officer, he took Hable's testimony,

10  Lovejoy's testimony, and came to the conclusion that the

11  officers was telling the truth, and they found me guilty.

12  Q.   Were you able to ask some questions during the hearing?

13  A.   Yes.  I had one main question that I had for both

14  defendants that I called, Hable and Officer Lovejoy.

15  Q.   And was there a stenographer to record your question?

16  A.   No, not in the hearing room.  In the hearing room what

17  takes place is the hearing is recorded, and once it's recorded,

18  then they would take it to a stenographer, if need be, and he

19  or she would tape what they -- would type what they would hear.

20          MR. AHLSTROM:  May I approach, Your Honor?

21          THE COURT:  Yes.

22  BY MR. AHLSTROM:

23  Q.   I'm going to hand you what's marked as Plaintiff's

24  Exhibit 17.

25  A.   This is the transcripts from the hearing.

1    Q.   And I'll refer you to Page 72.  It's the page up in the

2    upper right-hand corner.

3    A.   Okay.

4            MR. AHLSTROM:  Your Honor, I'll offer Exhibit 17 at

5    this point.

6            THE COURT:  Off the record.

7            (Discussion held off the record.)

8            THE COURT:  I'm sorry.

9            MR. AHLSTROM:  I offer Exhibit 17.

10           MR. ZIMMERMAN:  Your Honor, we have a previous

11   objection, a written objection for the admission of this.

12           THE COURT:  So noted.

13   BY MR. AHLSTROM:

14   Q.   What was your question to Mr. Lovejoy?

15   A.   Okay.  The question that I presented to Officer Lovejoy

16   was, "Do you know how the inmate got a wound on his forehead?"

17   Q.   And what was Mr. Lovejoy's response?

18   A.   Mr. Lovejoy's response was, "No, I don't."

19   Q.   I'll refer you to Page 82.  And what was your question to

20   Mr. Hable?

21   A.   Okay.  My question to Mr. Hable was the same question that

22   was directed to Officer Lovejoy.  I wanted to know how did I

23   receive that wound to the baseline of my forehead.

24   Q.   And what was Defendant Hable, what was his answer?

25   A.   Mr. Hable's reply was, "I really don't know.  Maybe it was

1   during the struggle when we were trying to get the cuffs on

2   him," but I was already cuffed.

3   Q.   And what was the result of the hearing?

4   A.   The result, the conclusion, I was found guilty.

5   Q.   Mr. Johnson, you've testified about an assault that

6   happened as the guards were taking you to rec.  Were you

7   supposed to go to rec on November 2nd?

8   A.   No.  No, I was deprived of exercise that day.

9   Q.   If you were deprived, why did you say you wanted to go to

10  rec?

11  A.   Because I didn't know I was deprived.

12  Q.   Do you know why the guards attacked you on November 2nd,

13  2002?

14  A.   Yes.  That was a retaliation for an assault that took

15  place on September 7th of the same year in 2002.

16  Q.   Less than a month prior?

17  A.   Yes.

18  Q.   And what happened less than a month prior on

19  September 7th, 2002?

20        MR. ZIMMERMAN:  Objection, Your Honor.  I don't

21  believe that September 7th is less than a month prior to

22  November 2nd.

23        THE COURT:  Well, you can certainly clear that up on

24  your examination.  Go ahead.

25  BY MR. AHLSTROM:

1    Q.    Do you need the question again?

2    A.    Rephrase it.

3    Q.    Yeah.  What happened on September 7th, 2002, that you

4    believed led to the assault on November 2nd?

5    A.    Okay.  Well, September 7th of '02, I was at the barber

6    shop getting my hair cut, and me and another inmate got up at

7    the same time.  Officer Hodge, he run -- at the time he was

8    running the access of the haircut programs.  He said, "Hey,

9    hey, hey, what are you all doing?"  Because, you know, he

10   thought a problem was going to happen.

11        So he told me to sit down so I sat down, so I sat down.

12   The other individual sat down.  He told me to come around

13   through the middle instead of walking around, because I was

14   over here by where one cell -- I mean 1 gallery at and the

15   individual was a few feet from me on -- by 2 galleries.  So

16   instead of me walking by, I would have to pass him.  So he just

17   directed me to walk through the middle.

18        So as I was walking through the middle, because I was

19   locking on C3 gallery, as I was going back to C3 gallery,

20   Officer Hable was coming off of C3 gallery.  He asked Officer

21   Hodge what was the problem.  Officer Hodge said, "No, wasn't no

22   problem.  They just both got up at the same time."

23        So as I'm walking past Officer Hable, he's behind me, so

24   he tells me, "Yo, when the officer tells you to do something,

25   you do it."  So I stopped, and I asked him, I said, "Excuse

1  me?"  He said, "You heard me.  When the officer tells you to do

2  something, you do it."  So I said, "I complied with what he

3  said.  He just told you that it was no problem."

4      As I went to turn to proceed back to my cell, Officer

5  Hable struck me in the back of my head for no unknown reason.

6  When he struck me in the back of my head, he pushed me onto the

7  window in the -- like I just explained, there's a window in

8  front of your cell.

9      So when he pushed me onto the window, a bunch of officers

10  came running down the gallery.  That's when they threw me on

11  the floor.  They handcuffed me to the back and hand -- and put

12  the leg shackles around my ankles.

13  Q.  Other than Defendant Hable, were any of the other

14  defendants involved in this September 7th incident?

15  A.  Yes.

16  Q.  Who?

17  A.  Sergeant Osborne was also one of the defendants that

18  assaulted me that day also.

19  Q.  After the September 7th assault, did any of the guards say

20  anything to you before the events on November 2nd?

21  A.  On the events of September 7th?

22  Q.  After September 7th, did any of the guards say anything to

23  you?  Were there any threats?

24  A.  Oh, yes.  Officer Hable on September 7th told me that he

25  was going to get me again, that was exactly his words, and I

1    wrote that in a grievance to the superintendent.  That's why I

2    was requesting to be moved.

3        Also I wrote to the superintendent that Officer -- I can't

4    remember his name at the time.  Anyway, he threatened me also

5    and said that he was going to do some bodily harm to me also.

6        So inside the body of the grievance I was explaining to

7    Superintendent McGinnis, who was the superintendent at the

8    time, that these officers threatened to do bodily harm to me,

9    that, you know, I'm letting you know in advance and I'm

10   requesting to be transferred from this facility.

11   Q.   What was the result of your grievance against Defendant

12   Hable?

13   A.   Nothing, the grievance, nothing, nothing.  They just

14   denied it.

15   Q.   Mr. Johnson, at what facility do you live today?

16   A.   Southport.

17   Q.   And do you still see the defendants?

18   A.   Yes.

19   Q.   How often?

20   A.   A lot.  I see Officer Lovejoy because I am in C block.  He

21   works rec detail from time to time.

22   Q.   Do you see any of the other defendants?

23   A.   Unless I'm in A block, I will see Officer Hable.

24   Q.   And how does it make you feel when you see these

25   defendants today?

1   A.   Well, a lot of times I have -- I put down to go see the

2   social worker because I told her I be having -- when I see a

3   multitude of prison guards, I be having recurring nightmares,

4   anxiety attacks, my hands start sweating because I don't know

5   if these officers are going to do what they did before.

6        So, you know, I always request to put down to speak to the

7   social worker every time she come around.  She takes me out and

8   she speaks to me and stuff like that.  She also tells me that

9   she's going to try to get me -- she's going to try to help me,

10  you know, get transferred from this facility.

11  Q.   Have you ever had any other physical altercations with the

12  defendants?

13  A.   Yes.  While I was on my way coming here, I was assaulted

14  again in the receiving room part of Southport coming here, and

15  they didn't take use of force photos at Southport.  They took

16  the use of force photos in Wende's, the facility that I was in.

17       And I wrote a grievance and I showed it to the attorneys,

18  and as soon as I got there the sergeant from Wende's noticed

19  that I had two bumps and some redness, some bruises by my eye,

20  and he asked me what happened.  And I told him that I just got

21  finished getting assaulted again on my way coming here.

22       And he said, "Listen, we're going to take use of force

23  pictures.  We're going to cover our ass because we don't want

24  the attorneys to think that" --

25            MR. ZIMMERMAN:  Objection, Your Honor, to the

```
 1   hearsay.
 2           THE COURT:  Who said this, sir?
 3           THE WITNESS:  Sergeant -- I don't have his name right
 4   now, but it was sergeant something, but that's the sergeant who
 5   took the use of force photos.
 6           MR. AHLSTROM:   Your Honor --
 7           THE COURT:  Overruled.
 8   BY MR. AHLSTROM:
 9   Q.   Did any of the defendants say anything to you?
10   A.   The defendants standing here, no.
11   Q.   Or any of the defendants involved in this use of force on
12   your way over here.
13   A.   No, no, just Officer Jane, which was the backup officer,
14   Officer Marshall's brother, Sergeant Herrick, and Officer
15   Miller.
16   Q.   Mr. Johnson, what is the beat down squad?
17   A.   Okay.  The beat down squad is, you know, individuals, it's
18   mainly in A block, because A block is where they put the waist
19   chain on you so tight that it's literally crushing your -- you
20   know, the side of your ribs, and they do this to provoke you.
21   And you would tell them --
22           MR. ZIMMERMAN:  Your Honor, I'm going to object to
23   the relevance of this.  He just -- he said this happens in A
24   block.  We're talking about what happened in C block.
25           THE COURT:  Sustained.
```

```
 1              MR. AHLSTROM:  One second, Your Honor.

 2              I have no more questions, Your Honor.

 3              THE COURT:  We'll take a 20-minute recess, ladies and

 4     gentlemen.  During the recess please do not discuss the case

 5     with anyone, and do not discuss it among yourselves.

 6              The Court will be in recess.

 7              (A recess was taken at 11:38 a.m.)

 8              (Jury present in the courtroom at 11:59 a.m.)

 9              THE COURT:  Sorry to keep you waiting, ladies and

10     gentlemen.

11              All right, Counsel.

12              MR. ZIMMERMAN:  Your Honor, before I begin, I'd like

13     to move to strike the testimony Mr. Johnson gave regarding an

14     alleged incident that occurred on his way here.  Once he

15     described the individuals involved, none of them were the

16     defendants.  They're obviously trying to prejudice the jury,

17     but there's no relevance to this case.

18              THE COURT:  All right.  Objection is overruled.

19

20                        CROSS EXAMINATION

21     BY MR. ZIMMERMAN:

22     Q.   Good morning, Mr. Johnson.  It is still morning for a

23     couple minutes.

24     A.   Good morning to you.

25     Q.   And, sir, the incidents that you've described both on
```

 1   September 7th, as well as November 2nd occurred on C block in

 2   Southport, correct?

 3   A.   Yes.

 4   Q.   And both occurred on the first floor?

 5   A.   Yes.

 6   Q.   And you've described pretty well for the jury how C block

 7   is laid out.  I just have a couple of questions that if

 8   you're -- if you're standing in -- do you refer to it as the

 9   main floor or the day room?  What do you call that big area

10   where the console is?

11   A.   Well, some call it -- I just refer to it as the -- I

12   always say the main floor.

13   Q.   The main floor.  If you're in the main floor and you're

14   looking at number 1 gallery, number 2 gallery is on your left;

15   is that correct?

16   A.   Yes.

17   Q.   And then you would have to turn to look at number 3

18   gallery which would then be -- have number 4 gallery on its

19   left; is that correct?

20   A.   Yes.

21   Q.   Okay.  And on September 7th, you were locking in on C3

22   gallery; is that correct?

23   A.   Yes.

24   Q.   And as you described it, as you enter any of the

25   galleries, all of the cells are lined up -- I'm sorry -- no,

1    that's not true.  Well, if you enter any of the galleries, all

2    of the showers are at the front; is that correct?

3    A.    Yes.

4    Q.    And there's three in each gallery?

5    A.    Yes.

6    Q.    And they're essentially like cells, correct?

7    A.    Yes.

8    Q.    They have a sliding door and the same kind of mesh that

9    the cells do?

10   A.    Yes.

11   Q.    Except the only thing that's in them is a bench and

12   there's actually like a spigot up on the wall?

13   A.    Shower stall.

14   Q.    Okay.  And the inmates can't control that water, right?

15   A.    No.

16   Q.    Yeah.  It's turned on by the officers and turned off by

17   the officers, correct?

18   A.    Yes.

19   Q.    Okay.  And if you're looking down number 1 gallery, all

20   the cells are on the left; is that correct?

21   A.    Yes.

22   Q.    And then if you're looking down number 2 gallery, all of

23   the cells are on the right?

24   A.    Yes.

25   Q.    And the same is true of the number 3, number 3 are all on

1   the left?  Yes?

2   A.   Yes.

3   Q.   And number 4 are all on the right?

4   A.   Yes.

5   Q.   And as you described it on September 7th, you were signed

6   up for haircut; is that correct?

7   A.   Yes.

8   Q.   And actually Officer Hable was the one who let you out for

9   your haircut that day; is that correct?

10  A.   No.

11  Q.   It's not correct?

12  A.   He was the one escorting me.

13  Q.   Okay.  He is -- some other officer handcuffed you and had

14  you out of the cell?

15  A.   No.  Officer Hable was the one who handcuffed me.

16  Q.   Okay.

17  A.   He was doing -- he was escorting.

18  Q.   Okay.  Maybe I didn't make myself clear.  To get to the

19  haircut, you had to put your hands behind your back; is that

20  correct?

21  A.   Yes.

22  Q.   And when you were in the cell?

23  A.   Yes.

24  Q.   And put your hands through the feed-up slot?

25  A.   Yes.

1    Q.    And it was Officer Hable who then handcuffed you?

2    A.    Yes.

3    Q.    And he would have indicated to the console to have the

4    gate slide open?

5    A.    Yes.

6    Q.    And then he would have escorted you to the main room?

7    A.    Yes.

8    Q.    And at that time you would have been assigned by Officer

9    Hodge where to sit; is that correct?

10   A.    Yes.

11   Q.    Okay.  You don't have leg irons on; is that correct?

12   A.    No.

13   Q.    Or a waist chain?

14   A.    No.

15   Q.    And as I understand it, sir, when the haircuts are being

16   done, they're actually -- the individual sits in a regular

17   chair; it's not a barber's chair, correct?

18   A.    Yes, it's a regular chair.

19   Q.    And there's four inmates getting a haircut at any one

20   time; is that correct?

21   A.    Yes.

22   Q.    Four chairs?  And the chairs are separated from each

23   other; is that correct?

24   A.    Yes.

25   Q.    So the inmates are not in a line, correct?

1    A.    Yes.

2    Q.    And they have so-called cadre inmates that are doing the

3    actual haircutting?

4    A.    Yes.

5    Q.    And you got your haircut that day?

6    A.    Yes.

7    Q.    And when you finished your haircut, you stood up and

8    another inmate stood up, correct?

9    A.    Yes.

10   Q.    That's against the rules, right?

11   A.    Yes.

12   Q.    One inmate moving at a time is the rule in Southport,

13   correct?

14   A.    Um-hum.

15   Q.    Yes?

16   A.    Yes.

17   Q.    You have to say yes.  You can't say um-hum.

18         And Officer Hodge said something to you about it?

19   A.    Yes.

20   Q.    Okay.  And there was some yelling back and forth, wasn't

21   there?

22   A.    No.

23   Q.    No raised voice at all?

24   A.    No.

25   Q.    Okay.

1    A.   The only thing, he said, "Hey, hey, hey," because we both

2    stood up at the same time.

3    Q.   When he said, "Hey, hey, hey," was it loud?

4    A.   No, it was basically like, you know, "Hey, hey, what's

5    happening?"

6    Q.   Okay.  In a commanding voice?

7    A.   No, not at all, like, you know, "What are you doing," like

8    that, that's all.

9    Q.   And Officer Hable comes off of gallery number 3?

10   A.   No, not at that time.

11   Q.   Not at that time, but once you started moving towards the

12   gallery?

13   A.   Yes.

14   Q.   Okay.  And as you say, the way that you took -- although

15   you did it at Officer Hodge's direction, the way that you took

16   is not the way that you normally would have taken; is that

17   correct?

18   A.   No, I took the same way that -- that I went because I was

19   sitting in the first seat.

20   Q.   Okay.  But you said you were specifically directed that

21   way so you wouldn't pass in front of the other inmate?

22   A.   Yes, so I wouldn't walk past the other inmate that was

23   sitting in the row where I was.

24   Q.   And you were put off, weren't you, because of the incident

25   with Officer Hodge?

1   A.   No, not at all.

2   Q.   Okay.  And you walked past Officer Hable?

3   A.   Yes, as I was on my way going onto the gallery he was

4   coming off.

5   Q.   Okay.  And you walked past him to go onto gallery 3?

6   A.   Yes.

7   Q.   And he came down gallery 3?

8   A.   No.  He was already coming out gallery 3.

9   Q.   But I'm saying you walked past him?

10  A.   Yes, to get to gallery 3.

11  Q.   And started walking down?

12  A.   Yes.

13  Q.   And he reentered gallery 3?

14  A.   Yes, behind me.

15  Q.   Okay.  And as you said before, when you leave your -- when

16  you leave your cell, you wait to be told what to do by an

17  officer, right?

18  A.   Yes.

19  Q.   And when you go to the haircut, you wait to be told that

20  you can leave by the officer, correct?

21  A.   Yes, um-hum.

22  Q.   Okay.  And Officer Hable reached out to touch you in some

23  way; did he not?

24  A.   No.

25  Q.   No, okay.  And you turned around and kicked him, didn't

1   you?

2   A.   No.

3   Q.   And you spit at him?

4   A.   No.

5   Q.   Okay.  Officer -- did Officer Hable grab your handcuffs at

6   any time?

7   A.   No.

8   Q.   Okay.

9   A.   No.

10  Q.   And Officer Hodge responded, didn't he?

11  A.   Yes, when Officer Hable had me up against the window.

12  Q.   Okay.  And he pushed you up against the window, correct?

13  A.   Yes.

14  Q.   Okay.  And he and Officer Hodge eventually took you to the

15  floor; is that correct?

16  A.   Yes.

17  Q.   And you said a group of officers responded, correct?

18  A.   Yes.

19  Q.   And, in fact, isn't that the standard operating procedure

20  at Southport is when there's an altercation between an inmate

21  and an officer, as many officer as possible respond?

22  A.   I don't know the procedure how that go, but I would -- I

23  would presume so --

24  Q.   Okay.  That --

25  A.   -- came over whatever officer is available in that area.

1  Q.   And that's been your experience at Southport?

2  A.   Yes.

3  Q.   And you're -- now, you said Officer Osborne was there.  Is

4  it your testimony Officer Osborne actually laid hands on you on

5  September 7th?

6  A.   Yes, he was also assaulting me, yes.

7  Q.   Okay.  And at some point they -- you were stood to your

8  feet and were taken off of gallery 3; is that not correct?

9  A.   After, you know, they banged my head against the gate

10  several times.

11  Q.   Okay.

12  A.   Yes.

13  Q.   And you were taken to the shower in gallery 4, correct?

14  A.   No, on 2 gallery.

15  Q.   On 2 gallery, okay.  And on your way you continued

16  spitting at Officer Hable; did you not?

17  A.   No, no.

18  Q.   Okay.  And did you tell Officer Hable, "Wait until I see

19  you upstairs, I'll fuck you up"?

20  A.   No.

21  Q.   After that, you wrote a grievance, correct?

22  A.   Yes.

23  Q.   Okay.  And would it be fair to say that you weren't

24  particularly happy with Officer Hable?

25  A.   I wouldn't say that.  I just, you know, wanted to be

1    transferred because of the threats that were made from the

2    officers on that particular day.

3    Q.   You didn't like Officer Hable after that, did you?

4    A.   I didn't even know him.  I wasn't angry with him at all.

5    Q.   Well, the officer who slammed you up against the wall, and

6    then when they got you down, they were beating you, you weren't

7    angry at him?

8    A.   At some point, yeah, because there was no need for that.

9    Q.   Okay.

10   A.   Anybody would be angry at that, yes.

11   Q.   Fair enough.  Now, sir, on November 2nd you were in your

12   cell after lunch; is that correct?

13   A.   November 2nd?

14   Q.   Yes.

15   A.   Was I in my cell after lunch?

16   Q.   Yes.

17   A.   Yes.

18   Q.   The rec run for your gallery happened after lunch was

19   served; is that correct?

20   A.   Yes.

21   Q.   And after lunch had been cleared away?

22   A.   Yes.

23   Q.   All right.  And you were waiting for rec?

24   A.   Yes.

25   Q.   And you've described the cells -- you've described the

1   cells and you've got Plaintiff's 31 that's a picture of it.

2   Can you see that, sir, plaintiff's 31?

3   A.   Yes.

4   Q.   Okay.  And this box I'm pointing to in the middle of the

5   door that's sort of a white square, that's actually got a metal

6   door on it, doesn't it?

7   A.   Yes.

8   Q.   Okay.  And that metal door locks; does it not?

9   A.   Yes.

10  Q.   And for a level one inmate such as you were that day,

11  that -- that feed-up slot remains locked during the -- most of

12  the day unless there is a reason to unlock it and put a package

13  through it or put something through it?

14  A.   Yes.

15  Q.   And, sir, the gallery itself is not very wide; is that

16  safe to say?

17  A.   No.

18  Q.   Okay.  It's maybe four, five feet wide?

19  A.   Yes.

20  Q.   Okay.  And so when you're -- when you're in your cell, you

21  had talked about what you could see from your cell, you can see

22  in front of the cell?

23  A.   Yes.

24  Q.   Okay.  And I suppose if you moved to one side of the door,

25  you could see over to the left a little bit, right?

```
 1  A.    Yes.
 2  Q.    Okay.  And then, again, if you moved over to the right --
 3  does the bed come all the way to the front of the cell?
 4  A.    No.
 5  Q.    Okay.
 6  A.    Like say this is the bed, this is the bed, it stops here
 7  so that there's a little space here where a person can be right
 8  here.
 9  Q.    And you could -- you could get yourself in front of the
10  bed and look off and see a little bit over to the right down
11  the gallery, correct?
12  A.    No, you would have to come by the door, by the cell door.
13  Q.    No, no.  I'm saying if you're in front of bed --
14  A.    Um-hum.
15  Q.    -- and you're looking out of the cell, you'd be able to
16  see a little bit to the right that's not in front of your cell,
17  it's in front of the cell next to you, right?
18  A.    I don't understand the question.  You're saying -- you're
19  saying if you're by the bed or in front of the bed?
20  Q.    In front of the bed, I'm sorry.
21  A.    In front of the bed?
22  Q.    Yeah, in between the bed and the front of the cell.
23  A.    Can you see to the side?
24  Q.    Yeah.  You can see a little bit to the right, correct?
25  A.    Yes, if you're -- if you're standing in front of the cell,
```

 1   yeah, you could see to the side a little bit.  You can see

 2   couple of cells down.

 3   Q.   Okay.  And as you testified before, the mesh -- you can't

 4   put your hand through the mesh, correct?

 5   A.   No, not your hand, no.

 6   Q.   And mirrors are not allowed for level one inmates at

 7   Southport, are they?

 8   A.   There's a mirror in the cell.

 9   Q.   No, I mean handheld mirrors.

10   A.   No.

11   Q.   So unlike other prisons, you can't stick your hand through

12   with a mirror and kind of see what's going on down the gallery,

13   can you?

14   A.   No.

15   Q.   And you described the process of how an inmate prepares

16   for recreation or that you put your hands through, your hands

17   get cuffed in the front?

18   A.   Yes.

19   Q.   And you turn around, and you wait for the officer -- after

20   the door opens, you wait for the officer to tell you to back

21   up, right?

22   A.   Yes.

23   Q.   And once you've backed up, you said the two officers are

24   on either side of you, correct?

25   A.   Yes.

1    Q.    And that's when they apply the waist chain, correct?

2    A.    Yes, that's when they will, yes.

3    Q.    And your hands, your cuffed hands have to remain basically

4    in front of you where your belt buckle would be if you had a

5    belt, correct?

6    A.    Yes, yes.

7    Q.    And you have to remain still during that time, correct?

8    A.    Yes.

9    Q.    And because at that point you're waiting for further

10   direction from the officer, right?

11   A.    Yes.

12   Q.    Okay.  And once the waist chain is applied, it's -- the

13   idea is to keep your hands chained as close to your body as

14   possible, correct?

15   A.    Yes.

16   Q.    Once the waist chain is applied, you have to wait for the

17   officer to say, "Go on up to the end of the gallery," correct?

18   A.    Yes.

19   Q.    And at the end of gallery, you can't just walk out onto

20   the floor?  You have to wait at the end of gallery until an

21   officer on the floor tells you to come out, correct?

22   A.    Yes.

23   Q.    And at that time you have to get against the wall, and

24   that's when the frisk takes place?

25   A.    Yes.

```
1    Q.    And the metal wanding?

2    A.    Yes.

3    Q.    Okay.  And then you have to be told to move to the door?

4    You're not allowed to move until you can go -- until you're

5    told to go to the door to the yard, correct?

6    A.    Yes.

7    Q.    And once you get to the door, there's an officer at the

8    door, correct?

9    A.    Yes.

10   Q.    And then he will direct you out into the yard, correct?

11   A.    No, no.

12   Q.    You go out into the yard?

13   A.    Yeah, you just --

14   Q.    And there are two officers out in the yard, correct?

15   A.    Yes.

16   Q.    And then you follow their orders, correct?

17   A.    No.  You just go right into the rec pen, the designated

18   rec pen, and they close it.

19   Q.    But they tell you which rec pen?

20   A.    No.

21   Q.    You know that?

22   A.    You would already know.

23   Q.    Okay.  And then you have an hour of rec, and then

24   basically the steps are repeated backwards, correct?

25   A.    Yes.
```

1    Q.    Now, on November 2nd, Officers Hable and Lovejoy came to

2    get you for recreation; is that true?

3    A.    Yes, yes.

4    Q.    Okay.  And they asked if you were going to rec, and you

5    said yes?

6    A.    Yes, Officer Hable, yes.

7    Q.    Okay.  And was there a sergeant there at the time?

8    A.    No.

9    Q.    And you put your hands through the slot and they cuffed

10   you?

11   A.    After he gave me my coat.

12   Q.    Who gave you your coat?

13   A.    Hable.

14   Q.    Okay.  And put your coat on?

15   A.    Yes.

16   Q.    Because it was November and it was cold out?

17   A.    Yes.  He asked me did I want my coat.  I told him yes.

18   Q.    And your coat would have been on the window across from

19   your cell, correct?

20   A.    Yes.

21   Q.    Okay.  And, sir, then you described how each one grabbed

22   you by your arms and Officer Lovejoy tripped you?

23   A.    Yes.

24   Q.    And you ended up on the floor?

25   A.    Yes.

```
 1   Q.   And they started applying force, they started hitting you?
 2   A.   Yes.
 3   Q.   And at that time you defended yourself, correct?
 4   A.   No.
 5   Q.   Okay.  Sir, do you recall in November of 2006, giving a
 6   deposition in this case?
 7   A.   Yes.
 8   Q.   And do you recall an assistant attorney general coming to
 9   you and asking you some questions about what happened to you
10   and what this case was about?
11   A.   Yes.
12   Q.   Okay.  Sir, I'm going to show you what's been --
13           MR. ZIMMERMAN:  May I approach, Your Honor?
14           THE COURT:  Yeah.
15   BY MR. ZIMMERMAN:
16   Q.   -- what's been marked as Defendant's Number 5 for
17   identification and ask you to take a look at that.  Have you
18   seen that document before, sir?
19   A.   Yes, yes.
20   Q.   Okay.  Did you review it at some point between 2006, and
21   today?
22   A.   No.
23   Q.   You've never read that?
24   A.   No.
25   Q.   Okay.  You didn't review it in preparation for your
```

1    testimony today?

2    A.    No.

3    Q.    Okay.  I'm going to ask you to take a look at Page 13 of

4    that document.  Do you see that page, sir?

5    A.    Yes.

6    Q.    Okay.  And I'm going to ask you to start reading to

7    yourself at Line 18.  Do you see there's the numbers that are

8    down the side there?

9    A.    Yes.

10   Q.    Okay.  And do you see a paragraph that begins Line 18?

11   A.    Yes.

12   Q.    Okay.  Can you read that just to yourself, sir?

13   A.    Um-hum.

14   Q.    And, sir, starting on Line 21 you said, back in November

15   of 2006, "So I'm going to defend myself."  You said that, sir,

16   didn't you?

17   A.    "And so when they grabbed me, I'm going defend my" -- yes.

18   Q.    Okay.  And I'm also going to ask you to look at Page 30 of

19   that document.

20   A.    Page 30?

21   Q.    Yes, sir.  And look at the question that starts on Line 5

22   and the answer that starts on Line 6 and just read that to

23   yourself.

24   A.    Say that again.

25   Q.    I'd like you to read the question that starts on Line 5

1    and the answer that starts on Line 6 but just read it to

2    yourself, not read it out loud.

3         And back in November of 2006 you said, "I'm trying to

4    defend myself."  You said that, sir, didn't you, Line Number 6?

5    A.   Yes.

6    Q.   Okay.  And then could you read Line Number 9 through Line

7    Number 13 again to yourself?

8    A.   Yes.

9    Q.   Okay.  And, in fact, at that time you said that you were

10   trying to defend yourself; is that correct?

11   A.   Yes.

12   Q.   And, in fact, you said you were struggling as well; is

13   that correct?

14   A.   Yes.

15   Q.   Okay.

16            MR. AHLSTROM:  Your Honor, can we read in a portion

17   of this testimony instead of a selection?

18            THE COURT:  Yes, absolutely.  You can do it at this

19   time or you can do it on redirect.

20            MR. ZIMMERMAN:  Your Honor, I would object to that.

21   I mean, I'm in the middle of cross-examination.  I'm using this

22   to refresh --

23            THE COURT:  The rule says it can be done at either

24   one of the two times.  You may do it now, sir.

25            MR. AHLSTROM:  Thank you, Your Honor.  Page 30,

 1  starting at Line 5.

 2          "QUESTION:  Did you struggle at all?

 3          ANSWER:  I mean, I'm trying to defend myself.  Any

 4  man in his right mind is going to try to defend himself to ward

 5  them off of him.

 6          QUESTION:  How did you defend yourself?

 7          ANSWER:  Well, I was struggling, you know.  I mean,

 8  he grabbing me for unknown reason and striking me at the same

 9  time.  I think any man in his right mind will try to defend

10  himself.

11          QUESTION:  How did the incident end in the cell?

12          ANSWER:  Well, the incident ended with them" --

13          MR. ZIMMERMAN:  Your Honor, I'm going to object at

14  this point.  He can -- that has nothing to do with the

15  questioning I have.  If Mr. -- if counsel wants to read that in

16  at any other point during his examination, but that's the point

17  that I -- part that I asked Mr. Johnson to read and that's the

18  subject matter that I'm discussing, not what happened at the

19  end, what happened during the incident.

20          THE COURT:  You may continue.

21          MR. AHLSTROM:  I'm going start at Line 14 again.

22          "QUESTION:  How did the incident end in the cell?

23          ANSWER:  Well, the incident ended with them -- with

24  me on the floor with the leg irons around -- around my legs, my

25  hands behind my back, and the waist chain on with my hands

 1    behind my back like that (indicating.)"

 2              THE COURT:  Okay.

 3    BY MR. ZIMMERMAN:

 4    Q.   And, sir, I believe you indicated that at some point in

 5    the struggle you ended up on your bed; is that correct?

 6    A.   Yes.

 7    Q.   And there were a number of prison guards in there,

 8    correct?

 9    A.   Yes.

10    Q.   In fact, all of the defendants were in the cell?

11    A.   Yes.

12    Q.   Okay.  And after Officers Lovejoy and Hable took you into

13    the cell, who was the next officer who showed up?

14    A.   A multitude of them just came in there.

15    Q.   Just came running?

16    A.   As soon as Hable pushed me in the cell and Officer Lovejoy

17    tripped me, that's when they all just came running.

18    Q.   And it's safe to say you don't know where they came from?

19    A.   Well, not offhand --

20    Q.   Right.

21    A.   -- at the time.

22    Q.   And, sir, were some of the officers from -- did you come

23    to find out from what's known as the shower crew?

24    A.   Yes.

25    Q.   Okay.  And, in fact, Officer Marshall was from the shower

1   crew, correct?

2   A.   Yes.

3   Q.   And, in fact, sir, the shower crew is another group of

4   officers different than the recreation crew or the exercise

5   crew; is that correct?

6   A.   I mean, they're the same, but they're just different --

7   rec detail or different -- different assignments, yes.

8   Q.   Different assignments.  And the shower crew handles taking

9   inmates, as the name would imply, out to do showers?  Yes?

10  A.   Yes.

11  Q.   As well as taking them out for other reasons, correct?

12  A.   No, just for the showers.

13  Q.   Just showers, okay.  And, sir, at some point then the

14  officers put a waist chain on you while you were -- while the

15  struggle was going on inside your cell?

16  A.   Yes, they put a waist chain on me.

17  Q.   And leg irons as well?

18  A.   Yes.

19  Q.   Okay.  And, sir, you described batons earlier in your

20  testimony, but none of the officers here used batons; is that

21  correct?

22  A.   No.

23  Q.   That is correct?

24  A.   No, not in this incident, no.

25  Q.   Okay.  So no batons were used?

1    A.    No.

2    Q.    Okay.  I guess you keep saying no, and maybe I'm -- were

3    batons used?

4    A.    No.

5    Q.    Okay.  There we go.  And there were also two sergeants in

6    there, correct?

7    A.    Yes.

8    Q.    Okay.  And Officer Raub and Officer Osborne, correct?

9    A.    Yes.

10   Q.    Okay.  And when did you first see Officer Raub inside the

11   cell?

12   A.    Okay.  While I was already on the floor, that's when

13   Officer Raub, Sergeant Osborne ran in there, and behind them

14   were the rest of the correction officers.

15   Q.    So --

16   A.    As soon as I was on the floor, he came.

17   Q.    They saw this -- so Sergeant Raub was the first to enter

18   your cell?

19   A.    That was the one I seen first, yes.

20   Q.    Okay.  And you were on the floor at that time?

21   A.    Yes.

22   Q.    And would it be safe to say that you were -- your head was

23   towards the back of the cell?

24   A.    Yeah, I was like a few feet from the desk.

25   Q.    Because you had been standing up and you had been tripped

1    and you went down, correct?

2    A.    Yes.

3    Q.    Okay.  And do you recall Officer Raub shouting, "Stop

4    resisting, stop resisting"?

5    A.    No.

6    Q.    Okay.  So Officer Raub and Officers -- or Sergeant Raub

7    and Sergeant Osborne entered the cell, and the other officers

8    come in behind them?

9    A.    Yes.

10   Q.    Okay.  And aside from the defendants, there was also an

11   Officer Torney (phonetic) in there, correct?

12   A.    He said he wasn't, but I remember -- I remember he was.

13   Q.    Okay.

14   A.    He said he wasn't though.

15   Q.    Okay.  And when you were on the ground, did Officers

16   Lovejoy and Hable stay in contact with you right on top of you

17   during the whole incident?

18   A.    Yeah.  As soon as Officer Lovejoy tripped me on the floor,

19   Sergeant Raub came in and the rest came in behind him, the rest

20   of the correction officers.  Like I said, some I don't know,

21   some I do.  Sergeant Raub had his knee on the side of my neck.

22   That's when Officer Lovejoy grabbed me by the collar of my coat

23   and banged my head on the floor twice.

24   Q.    And where was Officer Marshall during this time?

25   A.    Officer Marshall, at that time I didn't know where he was

1   at.  He probably was in with the rest of the officers that were

2   striking and kicking me.

3   Q.   Okay.  So the officers were arranged around you?

4   A.   I was on the floor with my head like this.  All I know, I

5   just -- I seen Sergeant Raub with his knee on my neck, and

6   Officer Hable banging my head on the floor.  That's when

7   Officer Houser grabbed me by the left side and an unidentified

8   officer grabbed me by the right.

9   Q.   But I'm asking you just when they all came in and you say

10  they started striking you.

11  A.   Yes.

12  Q.   Were they just sort of arrayed in a U around you?

13  A.   I mean, as soon as they all came in, they just started

14  kicking and punching.  It wasn't no -- you know, some were here

15  where I can see them, some were in back of me, to the side.

16  Q.   Okay.  And at some point then they stood you up, correct?

17  A.   Yes.

18  Q.   And it's your story that when they stood you up, they

19  uncuffed your hands and pulled your hands behind your back and

20  cuffed them behind your back?

21  A.   No.

22  Q.   When did they do that?

23  A.   That's when I was lying on the bed.

24  Q.   Okay.  And you were lying -- in what way were you lying on

25  the bed?

```
 1   A.   From the waist up, I was on my knees, and say this is the

 2   bed, from the waist up, in that manner.

 3   Q.   And so were you kind of kneeling on the bed?

 4   A.   No, I was -- my knees was on the floor, but from the waist

 5   up I was on the bed like this.

 6   Q.   I put that wrong.  You were kneeling on the floor bent

 7   over the bed?

 8   A.   Yes.

 9   Q.   Okay.  And your cuffs would have been in front of you at

10   that time?

11   A.   Yes.

12   Q.   And an officer uncuffed those cuffs?

13   A.   Yes.

14   Q.   And brought your hands behind them and cuffed you in the

15   back?

16   A.   Yes.

17   Q.   Okay.  And it was after that that you were stood up?

18   A.   No.

19   Q.   What --

20   A.   It was after that that I told -- I looked -- I was looking

21   over here, because Sergeant Raub was standing over here, and I

22   asked him, "Why is you letting these officers do that?  You're

23   the sergeant."  That's when I told you he struck me, told me

24   to, "Shut the fuck up, nigger," and Officer Marshall struck me.

25   Q.   And Officer Marshall struck you with his hand?
```

1    A.    Yes.

2    Q.    Okay.  At some point you're stood up?

3    A.    No.

4    Q.    You never stood up?

5    A.    No.

6    Q.    How did you end up --

7    A.    I was still -- well, after I turned my head, because I was

8    trying to block the onslaught of blows that was coming toward

9    my head and my face, Officer Hable was standing to this side.

10   Q.    Sir, did you ever end up on your feet inside your cell?

11   A.    Yes, after.

12   Q.    Okay.  So you were at some point stood up, correct?

13   A.    Yes.

14   Q.    Okay.  Do you remember who stood you up?

15   A.    Yes, Officer Hable.

16   Q.    Okay.

17   A.    And Marshall.

18   Q.    Hable and Marshall, okay.  And at some point you were

19   being taken out of the cell, correct?

20   A.    Yes.

21   Q.    Okay.  And an officer took your head and smashed your head

22   into the gate; that was your testimony, correct?

23   A.    Yes.

24   Q.    Okay.  When that occurred, where were you in the cell?

25   A.    Well, they were bringing me outside.

1  Q.   Just where were you in the cell, sir?

2  A.   I was on my way coming out.

3  Q.   Okay.  And was there an officer on either side of you?

4  A.   Yes.

5  Q.   Officer Hable?

6  A.   Officer Hable was on the left side of me.

7  Q.   Okay.

8  A.   And Officer Marshall was on the right side of me.

9  Q.   And was either of them outside of the cell?

10 A.   No.  They were right by me, right side -- like say

11 Marshall was here, and he had this arm.  Officer Hable was on

12 the left side of me and had the left side of my arm.

13 Q.   Okay.  And you were facing then towards the windows on the

14 outside of the gallery?

15 A.   That's where I was facing because they was walking me out.

16 Q.   Okay.  And where was Sergeant Raub at that time, sir?

17 A.   Sergeant Raub, I didn't see him.

18 Q.   Okay.  And by the way, you're saying Raul?

19 A.   How do you pronounce his name?

20 Q.   I think it's Raub.  I just want the jury to make sure that

21 we're talking about the same guy.

22 A.   I think it's Sergeant Raub.

23 Q.   It's R-A-U -- I thought it was B.

24 A.   B.

25 Q.   B, okay.  And where was Sergeant Osborne?

1   A.   Okay.   Sergeant Osborne was on the outside of the cell.

2   Q.   So he had left the cell already?

3   A.   Yes.

4   Q.   Okay.   And where was -- where was Lovejoy at that time?

5   A.   Where was Lovejoy?   I didn't see.

6   Q.   Okay.   Now, is Hable holding on to you with two hands?

7   A.   Yes.

8   Q.   And Marshall is holding on to you with two hands, correct?

9   A.   Yes, yes.

10   Q.   And Hable lets go of you so that he can grab your hair?

11   A.   Yeah, he -- well, he had one of -- one of his arms had --

12   one of had his hands had one of my arms.   With the other hand

13   he grabbed me by my hair, and that's when he ran my face

14   directly into the wall.

15   Q.   Okay.

16   A.   That's how there was a bloodstain coming, like I just

17   explained to you, in a U fashion on the wall like this.

18   Q.   Okay.   And when he cut you, were you inside the cell or

19   outside?

20   A.   I was inside the cell.

21   Q.   So before what you just described in terms of being hit --

22   having your face go against the wall, correct?

23   A.   Say that again.

24   Q.   When you were cut, it was before he put your head up

25   against the wall?

1    A.    Yes.

2    Q.    Okay.  And when he cut you, where were you in the cell?

3    A.    I was still on my knees with my hands behind my back.

4    Q.    Okay.  And was anyone holding on to you?

5    A.    At that time, I can't recall.  The only thing I know,

6    after he cut me, and he said that --

7    Q.    Okay.  But I'm just asking where you were at that time.

8    A.    Okay.

9    Q.    And were you near the toilet, were you near the desk, were

10   you near your bed, or were you dead center in the cell?

11   A.    I was dead center in the middle of the cell.

12   Q.    Okay.  And was Hable in front of you or in back of you

13   when he cut you?

14   A.    To the side.

15   Q.    Which side?

16   A.    The left-hand side.

17   Q.    Do you recall which officers or sergeants were in the cell

18   at that time?

19   A.    Sergeant Raub and Sergeant Osborne.

20   Q.    How about the officers?

21   A.    Marshall, Page, Boulas, Houser.

22   Q.    And where was Sergeant Raub?

23   A.    Sergeant Raub was to the right side of me.

24   Q.    And how about Sergeant Osborne?

25   A.    He was to the side.

1    Q.    Which side?

2    A.    To the right side.

3    Q.    Okay.  Was he in front of or behind Officer -- Sergeant

4    Raub?

5    A.    They were side by side just a few feet from each other.

6    Q.    And where was Marshall?

7    A.    Marshall was like right here to the side.

8    Q.    On your right side?

9    A.    Yes.

10   Q.    Okay.  And Officer Page?

11   A.    Officer Page was around the same thing.  Mostly all of

12   them was by -- around the same place before you come out of the

13   cell.  They were all standing around that way because my head

14   was to this side.  That's how I was talking to Sergeant Raub.

15   Q.    Okay.  And Officer Boulas, where was he?

16   A.    Officer Boulas was by the door, cell door.

17   Q.    Okay.  So also roughly to your right but a little in front

18   of you?

19   A.    Yeah, a little.  He was standing by the side of the door.

20   Q.    Okay.  And Officer Houser, where was he?

21   A.    I didn't see Officer Houser.

22   Q.    Okay.  I'm sorry, I thought you said you had -- he was in

23   the cell at that time.

24            MR. AHLSTROM:  Objection, Your Honor.

25            THE COURT:  Overruled.

1    BY MR. ZIMMERMAN:

2    Q.   And, sir, once you were taken out of the cell, you were

3    taken to the shower on C1 gallery, correct?

4    A.   Yes.

5    Q.   And locked in?

6    A.   Yes.

7    Q.   And you weren't hit after you were put in the shower,

8    correct?

9    A.   No, not at the time, no.

10   Q.   Okay.  So for the remainder of the day, there was no more

11   violence against you, correct?

12   A.   No.

13   Q.   Okay.  And you said that Nurse Peters wouldn't come to see

14   you; is that correct?

15   A.   Yes.

16   Q.   Okay.  And at some point you were taken out of the cell by

17   what you described as different guards.  Do you recall that?

18   A.   Yes, sir.

19   Q.   Okay.  And your clothes were cut off, correct?

20   A.   Yes.

21   Q.   And photographs were taken?

22   A.   Yes.

23   Q.   Now, sir, unfortunately I'm going to ask you to look at

24   what's been marked as Plaintiff's Exhibit 15 in evidence.

25   Unfortunately they do not have -- the photographs don't have

 1   any way of describing them other than describing them, so since

 2   they're in evidence I'll just ask you about them.

 3        You're looking at a photograph here.  That appears to be a

 4   picture of your back, is it -- from the back; is that correct?

 5   A.   Yes.

 6   Q.   And sir, was -- do you recall this photograph being taken?

 7   A.   Yes, that was September 7th.

 8   Q.   This was September 7th?

 9   A.   Yes.

10   Q.   Okay.

11        THE COURT:  We'll take our luncheon break at this

12   time.  Ladies and gentlemen.  We'll recess until about 2:00.

13   I've got another matter.  I think I can start at about 2, maybe

14   a little bit later, but I'll try for 2.

15        During the recess, please do not discuss the case

16   with anyone and do not discuss it among yourselves.

17        The Court will be adjourned.

18        (A recess was taken at 12:41 p.m.)

19        (Jury present in the courtroom at 2:23 p.m.)

20        THE COURT:  Sorry, folks.  I'm doing the best I can.

21   All right.  Counsel.

22        MR. ZIMMERMAN:  Thank you, Your Honor.

23        THE COURT:  We're not going to take a break this

24   afternoon.  We'll go till about 4:00 and I'll send you home.

25   This way you get home before it gets dark, and hopefully --

1   because I think it's better, and then tomorrow we'll go to

2   about -- we won't take a lunch break tomorrow.  We'll send you

3   home about 1:00, 1:30.  We'll go to about 1:00 tomorrow.  Okay.

4   All right.

5           MR. ZIMMERMAN:  Thank you, Your Honor.

6   BY MR. ZIMMERMAN:

7   Q.   Good afternoon, Mr. Johnson.

8   A.   And the same to you.

9   Q.   Thank you.

10          Now, I believe when you -- when we broke, I was asking you

11  about some photographs, but first I'm going to -- I want to

12  just take you back to when you were removed from the shower.

13  Do you recall that, sir?

14  A.   Yes.

15  Q.   And while you were in the shower, your testimony is that

16  your hands were cuffed behind your back; is that correct?

17  A.   Yes.

18  Q.   And the waist chain was through the ring in the cuffs in

19  the back?

20  A.   Yes.

21  Q.   And when they removed you from the shower, did they ask

22  you to turn and face the wall before they opened the shower

23  door?

24  A.   Yes.

25  Q.   And it slides open the way a cell door does, correct?

1    A.    Yes.

2    Q.    To the left?

3    A.    Yes.

4    Q.    And did they ask you to step backwards?

5    A.    Yes.

6    Q.    And was it at that point that they cuffed you in front?

7    A.    No.

8    Q.    And when they asked you to step backwards, did they then

9    direct you out of the gallery and into the main floor?

10   A.    No.  Before I came out, they told me that they was going

11   to cuff me.  Sergeant Osborne came to the shower that I was in,

12   told me that they was going to cuff me from -- uncuff me from

13   the back and bring my hands to the front because they were

14   going to take use of force photos.

15   Q.    And did -- was that -- did he tell you that before or

16   after the cell door opened?

17   A.    He told me before.

18   Q.    Okay.  And did he -- when that process was going on,

19   they -- again, they asked you to face the back of the shower?

20   A.    Yes.

21   Q.    And the cell door -- and the shower door opened?

22   A.    Yes.

23   Q.    And did they ask you to back out?

24   A.    No.

25   Q.    They entered the cell?

1    A.    Yes.

2    Q.    And who was it that entered the cell?

3    A.    At the time I didn't know the officer's name that uncuffed

4    me from the back to the front.  I didn't know his name.

5    Q.    Do you know it now?

6    A.    No.

7    Q.    Okay.  Was it either of the two officers who you named as

8    being part of the escort to the infirmary?

9    A.    No.

10   Q.    And when that officer -- he would have had to unlock your

11   waist chain; is that correct?

12   A.    It was two.

13   Q.    I'm sorry?

14   A.    It was two officers.

15   Q.    And do you know either of their names?

16   A.    No.

17   Q.    Okay.  In any event, the officers would have had to unlock

18   the waist chain; is that correct?

19   A.    No, they would have had to uncuff me one hand at a time,

20   then bring both of my hands to the front, and then cuff me that

21   way.

22   Q.    And that's what they did?

23   A.    Yes.

24   Q.    And did they then leave the cell?

25   A.    No.

1   Q.   What happened at that time?

2   A.   Sergeant Osborne told me to step back, and they was

3   stepping back with me, or they had already left out and they

4   were at the entrance of the shower.  So as I stepped back out,

5   as soon as I stepped out, that's when they grabbed me by my

6   arms and brought me out to the main floor.

7   Q.   So Sergeant -- after they took the cuffs from front to

8   back --

9   A.   Yes.

10   Q.   -- Sergeant Osborne directed you -- or them to bring you

11   back to the gallery -- I'm sorry -- bring you out to the

12   gallery?

13   A.   To step back out, yes, back out.

14   Q.   And then hence on to the main floor?

15   A.   Yes.

16   Q.   When the officers who were changing the cuffs from front

17   to back were in the cell, was the cell -- I'm sorry -- in the

18   shower, was the shower door opened or closed?

19   A.   No, it was already opened.

20   Q.   But did it remain open I guess is what I'm asking?

21   A.   No.  After they -- if my memory serves me right, after

22   they uncuffed me, they walked to the front of the shower, and I

23   think that's when Sergeant Osborne told me to back out.

24   Q.   But what I'm asking is the officers obviously had to walk

25   through the open shower door --

1    A.    Yes.

2    Q.    -- correct?  And did the shower door remain open while

3    they were in the shower with you?

4    A.    Yes.

5    Q.    Okay.  Now, sir, I'm going to show you a photograph that

6    you've already seen, but I have marked it for clarity as 15A.

7    Do you see that, sir?

8    A.    Yes.

9    Q.    Okay.  And I think you testified that that was a use of

10   force photograph from the September incident; is that correct?

11   A.    Yeah, from the September 7th.

12   Q.    And, sir, it appears that your shirt -- any shirts that

13   you were wearing were removed prior to that photograph being

14   taken?

15   A.    Yes.

16   Q.    And it appears that your pants had been lowered down prior

17   to that photograph being taken?

18   A.    Yes.

19   Q.    Okay.  And that isn't how you looked when you were getting

20   your haircut, correct?  I'm sorry.  That isn't how you were

21   dressed when you were getting your haircut?

22   A.    No.

23   Q.    When you were getting your haircut you had some kind of

24   shirt on?

25   A.    Yes.

1   Q.   And some kind of pants on?

2   A.   Yes.

3   Q.   Okay.  And, sir, I'm now showing you what's been marked

4   for identification as Exhibit 15E.  And do you see that

5   photograph, sir?

6   A.   Yes.

7   Q.   And that also -- that photograph also depicts the use of

8   force photos that were taken after the November incident; is

9   that correct?

10  A.   Yes.

11  Q.   Okay.  And that's a picture of your back?

12  A.   Yes.

13  Q.   As well as the side view, correct?

14  A.   Yes.

15  Q.   And, sir, I'm going to show you now what's been marked as

16  Plaintiff's 15F.  Do you see that, sir?

17  A.   Yes.

18  Q.   Those were also photographs that were taken as part of the

19  use of force --

20  A.   Yes.

21  Q.   -- on November 2nd, 2002?

22  A.   Yes.

23  Q.   And those are fair and accurate depictions of how you

24  looked?

25  A.   Yes, on November 2nd, yes.

1    Q.   And, again, sir, showing you what's been marked as

2    Exhibit 15G, those are also -- that's four photographs,

3    correct?

4    A.   Yes.

5    Q.   All taken following the use of force on November 2nd,

6    2002?

7    A.   September 7th.

8    Q.   7th, I'm -- so I'm sorry, November 2nd.  No, these are the

9    September ones?

10   A.   That's September 7th.

11   Q.   I'm sorry, I'm getting mixed up here.

12        And, sir, do you recall video also being taken during that

13   process?

14   A.   A video?

15   Q.   Yes.

16   A.   I don't -- I don't understand the question that you pose.

17   Q.   Sure.  When you were removed from the shower that day and

18   brought out to the main room for use of force photographs to be

19   taken, do you recall seeing an officer with a video camera?

20   A.   Yes.

21   Q.   Okay.  And the video was taken during the entire time that

22   the photographs were being taken; is that correct?

23   A.   If my memory serve me right, from the time when they

24   brought me out from the shower to the main floor, yes.

25   Q.   Okay.  And then continued on until you actually left the

```
 1   block; do you recall that?
 2   A.   Yes, to go to the infirmary.
 3   Q.   Sir, do you recall ever -- strike that.
 4        Sir, following this incident, you were deprived of
 5   recreation; is that correct?
 6   A.   Yes, according to DOCs, yes.
 7   Q.   Okay.  Now, sir, you testified on direct examination that
 8   following this incident you had pain in your back; is that
 9   correct?
10   A.   Yes.
11   Q.   And, in fact, you've had chronic pain in your back from a
12   disc problem for years before November of 2002; is that
13   correct?
14   A.   Well, I had been assaulted numerous times as Southport.
15   Q.   Okay.  But I just --
16   A.   This just increased the pain if that's what you're asking.
17   Q.   Sure.  What I'm asking is that before November 2nd, 2002,
18   say on November 1st, 2002, you had back pain?
19   A.   Yes.
20   Q.   In fact, the pain goes back to 1997; is that correct?
21   A.   Yes.
22   Q.   Okay.  And I believe you testified that -- in your
23   deposition that for a couple of months the pain was worse in
24   your back but then it went back to where it had been before the
25   incident on November 2nd; is that correct?
```

 1   A.   I'm not sure.

 2   Q.   Okay.  And, in fact, I believe you told the assistant

 3   attorney general that there's nothing you couldn't do on the

 4   day of the --

 5            MR. AHLSTROM:  I'm sorry, where are we at now?

 6            MR. ZIMMERMAN:  I haven't gotten to that.

 7            MR. AHLSTROM:  Oh, sorry.

 8   BY MR. ZIMMERMAN:

 9   Q.   You told the assistant attorney general that there was

10   nothing you could do on the day of the deposition that you

11   weren't able to do on the day before the incident.  Do you

12   recall that?

13   A.   Yes.

14   Q.   Okay.  Now, sir, you testified today that you were

15   deprived of recreation on November 2nd, 2002, on direct; do you

16   recall that?

17   A.   Yes, according to DOCs, yes.

18   Q.   Okay.  But you didn't know that?

19   A.   No, I didn't know that.

20   Q.   Okay.  And is it true, sir, that you didn't know that on

21   the day that you filed the complaint for this case?

22   A.   No, I didn't know that in its entirety, no, not at all.

23   Q.   Okay.  And do you recall there was a summary judgement

24   motion filed in this case?

25   A.   Yes.

1   Q.   And when you responded to that summary judgement motion,

2   you were not aware that you were deprived on that -- at that

3   time either, were you?

4   A.   No.

5   Q.   Okay.  And when you testified in this case in the

6   deposition that we've looked at, at that time you didn't

7   realize you were deprived that day; is that correct?

8   A.   No.

9   Q.   I'm sorry --

10  A.   No, no.

11  Q.   So you thought -- as of the day you were giving your

12  deposition, you thought you were down for rec on November 2nd,

13  2002?

14  A.   If my memory serves me right, yes, that's the reason why I

15  said that I wanted to go to rec.

16  Q.   Now, sir, do you exercise on a regular basis?

17  A.   No.

18  Q.   No.  In 2002, did you exercise on a regular basis?

19  A.   No.

20  Q.   No.

21  A.   I mean, I would do the exercises that -- you know, for my

22  back, you know, they -- I was going to physical therapy a

23  couple of times.

24  Q.   How about for your arms, did you do push-ups, that sort of

25  thing?

1    A.    Sometime I had to depending on the physical therapist said

2    sometime I have to lay on my stomach and hold myself up in

3    position to keep my back straight.

4    Q.    Well, I'm going to ask you to look at what's been marked

5    as 15A for identification.  And it looks to me like you're a

6    fairly well-built guy in that photograph.  Was that a result

7    of, you know, doing push-ups in your cell, cherry pickers, that

8    sort of thing?

9    A.    I don't work out, sir, if that's what you're implying.

10   Sometime I work out very little, like I do squats and stuff

11   like that, and like I said for the physical therapy, you know

12   for strengthening my back, that's it.

13   Q.    So you're just naturally well-built?

14   A.    I wouldn't call that built.

15   Q.    Okay.

16   A.    You have to define to me what you mean by that.

17   Q.    That's fair enough.  I'll agree with you on that.

18         And, sir, I believe you testified that since the incident

19   you've seen Officer Lovejoy from time to time; is that correct?

20   A.    Yes.

21   Q.    Because he works recreation from time to time?

22   A.    Yes.

23   Q.    And, sir, in terms of grievances, there's been some

24   discussion about the grievance procedure in DOCs, a grievance

25   is a written thing; is it not?

1    A.    Well, it's a written complaint.

2    Q.    That an inmate fills out and then sends to be taken

3    through the proper channels?

4    A.    Yes.

5              MR. ZIMMERMAN:  That's all I have, Your Honor.

6              MR. AHLSTROM:  Very brief, Your Honor.

7              THE COURT:  Sure.

8                        REDIRECT EXAMINATION

9    BY MR. AHLSTROM:

10   Q.    Just to avoid any confusion, the photograph, and this is

11   Exhibit 15F now, this photograph was taken on November 2nd?

12   A.    Yes.

13   Q.    And reflects your injuries from the November 2nd, 2002,

14   assault?

15   A.    Yes.

16   Q.    We heard a little bit about your deposition testimony, and

17   you said that you had defended yourself.  Were you in handcuffs

18   at that time?

19   A.    Yes.

20   Q.    And what additional restraints were applied?

21   A.    Leg irons to the ankles.

22   Q.    Anything else other than the handcuffs and the leg irons?

23   A.    And the waist chain.

24   Q.    And, again, connected with you defending yourself, did you

25   observe any of the defendants bleeding or noticeably injured on

1    November 2nd, 2002?

2    A.    November 2nd, no.

3              MR. AHLSTROM:   That's all I have, Your Honor.

4              THE COURT:   All right.

5              MR. ZIMMERMAN:   No recross, Your Honor.

6

7         (Testimony concluded.)

8                    *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3            I certify that the foregoing is a correct

4   transcription of the proceedings stenographically recorded by

5   me in this matter.

6

7

8                                   S/Yvonne M. Garrison, RPR

9                                   YVONNE M. GARRISON, RPR
                                    Official Reporter
10                                  U.S.D.C., W.D.N.Y.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25